I,WALTZER, Judge.
STATEMENT OF THE CASE
Entergy Louisiana, Inc. and Entergy New Orleans, Inc., formerly known as Louisiana Power & Light Company and New Orleans Public Service, Inc., appeal a judgment of the Civil District Court for the Parish of Orleans rendered on 30 April 1998. The judgment, rendered following a bench trial, awarded damages to Milton Johnson, Jr., for damages sustained as a result of defendants’ negligence. Damages included $150,000 general damages, $50,000 lost past and future earnings, and $12,574.94 medical expenses. We affirm.
STATEMENT OF FACTS
The record shows that on 13 February 1995, plaintiff was hunting in a marsh, contacted an unmarked fallen power line under the defendant’s control, and suffered electrocution. The evidence is uncontro-verted that plaintiff did not see the lines before the barrel of his gun made contact.
Plaintiff testified that a pre-existing back injury had resolved and was asymptomatic prior to the electrocution. Since the age of sixteen, he has worked as a roofer, hammering shingles, laying roofing materials, climbing ladders and | supervising other workers. Prior to the incident, he typically worked an eight to ten hour day.
According to the plaintiff, the electrical injury to his feet scabbed over in about a year, leaving him with no feeling, beyond pressure, in his feet, and with shooting pain around and above his knees. He also complains of shortness of breath. He testified that the medication prescribed by his doctors made him dizzy, weak, irritable and nauseous, and for that reason he now lives in pain. He tires easily, and is able to work as a self-employed roofer for no more than 5 hours a day, including transit time. He complains of personality change and irritability that affects his relationship with his fiancée and with his son. He can no longer roller skate, run and play football and other sports with his son as he used to; he cannot work in his yard or hunt alone. On cross-examination, he testified to weakness in both hands, shooting pain in his right hand and electrical burns on and numbness in his left hand. He is reluctant to climb up and work on roofs because the numbness in his feet causes him to trip and sometimes to stumble and fall.
Plaintiff testified that he was examined by Dr. Amparo Gutierrez of the LSU Medical Center. Dr. Gutierrez told him the tests she performed indicated nothing wrong with his nerves. Her examination revealed a condition similar to carpal tunnel syndrome in his right hand. She told him the problem could be somewhere else in his body that was not being tested.
He testified that he saw Dr. Jeanette M. Lopez, but that although she performed several tests, she did not perform a pinprick test:
Q: You told me she did the pinprick test on you?
A: No. She did several other types of tests.... The physician, as far as checking the strength, the pinprick she had me get up and walk and test my balance, the | ^reflexes and stuff like that and the strength in my hands and arms and legs and knees.
The parties stipulated that plaintiffs testimony would be corroborated by William J. Smith.
Dr. Lopez, an expert in adult neurology, testified that she saw plaintiff when she was employed by NeuroMedical Center in Hammond, Louisiana. She saw him on 24 March 1995, about forty days after the injury, and described him as a non-smoker, non-drinker with no significant past medical history other than the resolved back injury.
*723 Dr. Lopez described plaintiffs direct contact injury as having entered his body through his left arm, traveling down through his body, and out through his feet. According to the history he gave Dr. Lopez, and which she testified was consistent with the electrocution injury, he had little or no use of his left arm the first week following the incident. His teeth were extremely sore, which Dr. Lopez related to the electrical injury to the fifth cranial nerve, which affects the teeth and jaws. He suffered significant pain in the left arm, shoulder and hand, could not feel his feet, and had shooting pains up the back of his legs, more severe on the left side. She noted two “blow holes” the size of a fifty-cent piece on either side of his large toes, which formed the exit for the electrical current. He told Dr. Lopez that painful sensation was gradually returning to his feet, but he still experienced numbness and wore shoes at all times to protect his feet. She found the numbness and the shooting leg pains to be consistent with the electrical injury.
Dr. Lopez performed a pinprick test that objectively revealed lack of sensation below the ankles. He was unable to walk on his toes because of the exit wounds. Everything plaintiff told her was consistent with the electrical injury he|4suffered. She also noted a weakness in C8-T1 that she attributed to an underlying mild, early neck problem unrelated to the injury.
Dr. Lopez prescribed Dilantinor plaintiffs pain, but noted its side effects included ataxia, destruction of balance, gum abnormalities and skin sloughing.
Dr. Lopez saw plaintiff again on 24 March and on 18 April, when he told her the medication was not helping. Her examination found him to be improving, although his pain was still sufficiently severe that she discussed using Tegretol. Since its side effects were similar to Dilantin’s, and involved even greater likelihood of loss of balance, he told her he would rather not use the medication, whereupon she prescribed a Motrin/Novocaine gel to be applied topically. She also prescribed a Be-nadryl spray to alleviate itching of his lower limbs. On 18 May she saw plaintiff, who presented with similar complaints. She noted a new tenderness between the first and second toes and consulted with her colleague, Dr. Nyboer, who suggested there might be a focal infection and suggested an orthopedic evaluation. Dr. Lopez prescribed Percocet for plaintiffs pain.
When Dr. Lopez next saw plaintiff on 22 November, his left leg had been numb for two weeks and he complained of radiational pain from the hip or knee up to the back. Her examination revealed a likely herniated disc in the low back and she recommended a low back brace and prescribed Flexeril, muscle relaxants day and night and pain medication. She felt the abnormal sensations in the left foot were probably related to electrocution on top of the old herniated disc. She opined that the electrocution made the old back injury worse.
Two weeks prior to trial she examined plaintiff for a new problem, right hand pain. She noted pain, limited grip and extension of his fingers, but no signs of carpal tunnel syndrome.
| 5Pr. Lopez was asked to review the report of plaintiffs examination by Dr. Gutierrez, an LSU neurologist. According to Dr. Gutierrez’ report, cranial nerves were normal, all four extremities were full strength with no evidence of muscle damage. He had normal reflexes, coordination, and walking; however, the report shows no sensation from below the knees to the toes as well as in his fingertips. Dr. Gutierrez characterized the pinprick test she administered as “subjective”; however, Dr. Lopez opined that it was objective in the sense that it is extremely difficult to deny pain successfully, even if the only indication is by jumping or moving, if pain is felt with the pinprick. According to the report, Dr. Gutierrez checked only the nerves controlling plaintiffs right side, and did not check the nerves that control the *724 left side of plaintiffs body, where he complained of pain and weakness.
Dr. Gutierrez testified as an expert neurologist. Defendant had retained Dr. Austin Sumner to perform an independent medical examination, Dr. Sumner was not available when plaintiff reported for the exam on 18 March 1989, and Dr. Gutierrez performed the examination. Dr. Gutierrez did not receive written instructions or any other medical records. Plaintiff did not tell her about his previous back injury, information Dr. Gutierrez testified would have been important to the interpretation of the EMG and nerve conduction tests she planned. On cross-examination, she admitted that she took only a brief history that was not intended to be comprehensive; she asked plaintiff for the problems he was presently having, his concerns, and why he thought he was having the problems. She understood that plaintiff had previously seen Dr. England, who was on her service, and she had the note of Dr. England’s examination.
IfiShe performed a cranial nerve exam to determine nerve damage, and checked his motor nerves. She found no signs of nerve damage such as atrophy, fasciculation or wasting. She then tested his deep tendon reflexes in hands and arms, which are impaired when there is nerve damage. According to Dr. Gutierrez’ sensory examination of the plaintiff, he said he did not have or had a decrease in pinprick response from his knees down and his vibratory sense, measured by a tuning fork placed against the joint, was lacking. This demonstrated to the doctor a degree of disturbance in small and large sensory fibers.
Dr. Gutierrez also described the nerve conduction test she performed on plaintiff, in which needles are put over the nerve and direct response is recorded on a screen. The only abnormality she found in this test was mild carpal tunnel syndrome, consistent with his repetitive use of a hammer in the course of his employment as a roofer. She tested only his right leg. The test showed robust, normal sensory function. She opined that there was no sign of nerve damage.
The trial judge asked Dr. Gutierrez if plaintiff had refused the needle test. She testified that he refused the EMG portion of the test that looks at the muscles; according to Dr. Gutierrez, the nerve conduction test uses needles as well, but they are very small needles and plaintiff accepted them. She continued, “[W]hen we used those to elicit the responses, he was uncomfortable with them.”
Among the exhibits stipulated by the parties was the deposition of Steven J. Dick, M.D., a neurologist previously qualified as an expert in a civil case in this state, who treated plaintiff. Dr. Dick testified that he saw plaintiff on 2 April 1996, examined him and found scars on the insides of both large toes of his feet. On neurological examination plaintiff had diminished feeling in both feet and in the first and second digits of his left hand. On sensory examination, plaintiff ^demonstrated diminished sensation to pinprick or pain in his left arm from the elbow to the fingertips, most prominent in the first two digits. Temperature sense was also mildly diminished. Vibration sense was severely diminished from the toes to the ankles of both legs, and was impaired to the mid shin area. Position sense, the ability to tell what position the limb is in, was absent in the toes bilaterally. Pain and temperature sense were absent from the toes to the ankles and diminished or impaired to mid calf. The remainder of the neurological exam was normal. Plaintiff told Dr. Dick that he had had no relief with Tegretol, but had had mild success with Neurontin. Dr. Dick increased his dosage of Neurontin. Because the drug causes somnolence, plaintiff was uneasy about taking it, fearing it would impair him on his job. Dr. Dick referred plaintiff for further treatment to Dr. England.
*725 Dr. Dick testified that these physical problems were consistent with an electrocution injury. When asked whether the injuries were permanent, he testified that if nerve injuries have not improved after two years, the likelihood of further improvement is unlikely. He testified that he was concerned that plaintiffs symptoms had continued for almost two years, and opined that while the shooting pains might be treatable, the sensory problem was probably permanent. When asked if he felt as a physician that plaintiff was being honest, Dr. Dick replied that he did so believe.
The parties also stipulated to Melville Z. Wolfson, Ph.D.’s Technical Summary. According to the summary, plaintiffs wage loss between accident and trial was $30,-282. His loss from trial using the most conservative base wage of $16,127 (his reported 1993 income), after credit, was $143,788.
|sThe parties also stipulated to Cornelius E. Gorman, Ph.D., B.C.D.’s psychovoca-tional evaluation. Dr. Gorman found that plaintiff was not malingering. He had normal intelligence and adequate basic literacy, with an at risk profile due to the symptoms he reported. Plaintiff suffers limited ability to climb and hold tools, especially if vibration is present; limited driving due to numbness and inability to judge pressure on accelerator; tripping over his feet; works more slowly than before the injury and is seldom able to complete a job on his own without hiring additional helpers.
Dr. Gorman also found that plaintiff was unable as before to enjoy hunting, fishing, being active with his son and maintenance of home and vehicles. Posttraumatic stress interferes with plaintiffs overall level of functioning in all areas of his life. Dr. Gorman referred plaintiff to Dr. C.B. Serignar, M.D., a psychiatrist. Dr. Gor-man referred plaintiff to Leighton E. Stamps, Ph.D. for memory problems. Dr. Gorman concluded:
We have been presented with a cooperative fellow who has been seen twice.... He continues to work to the best of his ability. He is not malingering, ... One would not have expected a work life interruption absent the injury necessitating our interview. Unfortunately, individuals with similar disabilities fall victim to their symptoms and lead increasingly unproductive lives. At present, the personal and career outlook is worrisome ...
FIRST ASSIGNMENT OF ERROR: The trial court erred in considering plaintiffs “non-testimonial comments”.
During Dr. Gutierrez’ cross-examination, she testified that she knew that in discussions with the plaintiff, the name of Dr. England, her associate, came up, but |sshe did not have his records. At that point, the trial judge directed a series of questions to plaintiff, who had previously been sworn:
Q: Did you see Dr. England?
A: Yes, sir.
Q: Do you remember when or where?
A: No, sir.
Defense counsel did not object to this questioning or seek to cross-examine plaintiff concerning his responses.
Dr. Gutierrez then testified that Dr. England could have been seen on reference from Dr. Steven Dick as an outpatient. She did not consult with Dr. England concerning plaintiff. She further described the small needle test she performed on plaintiffs foot, and testified that he flinched and for that reason did not want to do the EMG. She testified that she always performs the nerve conduction test with small, thin needles, although some doctors put small electrodes over the surface of the nerve to perform the test. She testified that her report generated at the time of the test said the test was performed by surface recordings:
The trial judge then again directed a series of questions to the plaintiff:
*726 Q: Do you remember them putting the test pads on you?
A: No, sir. I’m scared to death of needles.
Q: No. Do you remember her putting pads on?
A: She put little things like watch batteries.
Q: What about your feet?
A: They were doing testing on my toes. There was never any needles or whatever in me.
ImDefense counsel did not object to this examination or ask to cross-examine plaintiff concerning the testimony.
Dr. Gutierrez then described the needles used in the test as electrodes, and noted that surface testing uses surface electrodes.
Defendant had the opportunity to object to the trial court’s asking questions of the plaintiff during the course of Dr. Gutierrez’s cross-examination. Counsel also could have asked to cross-examine plaintiff concerning his examinations by both Dr. Gutierrez and Dr. Lopez. If defendant was offended by the plaintiffs responses to the trial court’s questioning, counsel had the opportunity ask the trial court to re-call plaintiff, remind him that he was still under oath, and pursue the issue formally. The trial court implicitly invited such action when he told the attorneys at the conclusion of Dr. Gutierrez’ testimony, “I know I have broken down all procedure, but my curiosity is about to jump off the bench.”
We are instructed that before a fact-finder’s verdict may be reversed, we must find from the record that a reasonable factual basis does not exist for the verdict, and that the record establishes the verdict is manifestly wrong. Lewis v. State, Through Dept. of Transp. and Development, 94-2370 (La.4/21/95), 654 So.2d 311, 314; Stobart v. State, Through Dept. of Transp. and Development, 617 So.2d 880 (La.1993). Although we accord deference to the factfinder, we are cognizant of our constitutional duty to review facts [1] not merely to decide if we, as a reviewing court, would have found the facts differently, but' to determine whether the trial court’s verdict was manifestly erroneous, clearly wrong based on the evidence, or clearly without evidentiary support. Am-brose v. New Orleans Police Department Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 221; Ferrell v. Fireman’s Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742, 745.
When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court’s finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973).
Applying this standard, we find ample evidence of record to support the trial court’s judgment. Even if we were to delete the plaintiffs questioned testimony, there remains competent evidence from Dr. Lopez of plaintiffs chronic disabling numbness and pain that interfered substantially with his ability to perform his customary job and adversely affected his personal relationships and enjoyment of recreational pursuits. This evidence is corroborated by that of Dr. Dick and Dr. Gorman. Had this case been tried before a jury rather than to an experienced trial judge, the informality might have required a different result. However, under the circumstances of the instant case, the trial *727 court’s failure to admonish plaintiff that he was still under oath and to take his testimony in a formal manner is, at most, harmless error.
This assignment of error is without merit.
| ^SECOND ASSIGNMENT OF ERROR: The trial court abused its discretion in awarding plaintiff $150,000 in general damages.
Defendants suggest that the $150,000 general damage award was excessive, and cites lower awards rendered in two electrical contact cases, one involving injuries sustained in 1982 and the other decided in this Court in 1992. However, before any consideration of other awards can be made, our initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on this particular plaintiff is a clear abuse of the “much discretion” of the trier of fact. Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963). Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976)
The standard of review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from the jurisprudence is that the discretion vested in the trier of fact is “great,” and even vast, so that an appellate court should rarely disturb an award of general damages. It is only when the award is, in either direction beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert den. 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
[13The award of $150,000 for the injuries outlined herein is not obviously the result of passion or prejudice, and bears a reasonable relationship to the special damages. While a rational trier of fact could have decided that a lower award is more appropriate, we cannot conclude from the entirety of the evidence viewed in the light most favorable to the prevailing party in the trial court, that a rational trier of fact could not have fixed the awards of general damages at the level set by the trial judge or that this is one of those “exceptional cases where such awards are so gross as to be contrary to right reason.” Bartholomew v. CNG Producing Co., 832 F.2d 326 (5th Cir.1987); Youn v. Maritime Overseas Corp., supra, 623 So.2d at 1261.
In order to reduce this award, defendants must show that the trial court abused the great discretion accorded in awarding damages. In effect, the award must be so high or so low in proportion to the injury that it “shocks the conscience.” Moore v. Healthcare Elmwood, Inc., 582 So.2d 871 (La.App. 5th Cir.1991). This the defendant has failed to do.
This assignment of error is without merit.
THIRD ASSIGNMENT OF ERROR: The trial court clearly erred in failing to assess plaintiffs comparative fault.
In apportioning fault, the trier of fact has the same great, even vast, discretion it enjoys in assessing general damages.
[B]y analogy [to the review of awards of damages for personal injuries] the trier of fact is owed some deference in allocating fault, for the finding of percentages of fault pursuant to the comparative fault article. La.Civ.Code art. 2323, is also a factual determination, [citing cases].... [T]here is an analogy between excessive or inadequate quantum determinations and excessive or made- *728 guate | ¶ ¿fault percentage determinations. In both, the trier of fact, unlike the appellate court, has had the benefit of witnessing the entire trial and of reviewing first hand all the evidence.... After the court of appeal finds a “clearly wrong” apportionment of fault, it should adjust the award, but only to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court’s discretion. Clement v. Frey, 95-1119, 95-1163 (La.1/16/96), pp. 7-8, 666 So.2d 607, 610-611.
Applying this standard, we find no abuse of the trial court’s discretion in its finding that “[ljiability is clear.” Plaintiff testified that he was unable to avoid the unmarked, downed live power line. The defense stipulated that his testimony would be corroborated by William J. Smith. While a reasonable trier of fact could have allocated fault in some degree to plaintiff, we cannot say, based on our review of the record as a whole, that the trial court’s contrary conclusion constituted an abuse of its great, even vast, discretion.
This assignment of error is without merit.
FOURTH ASSIGNMENT OF ERROR: The trial court erred in not finding that plaintiff failed to mitigate his damages.
Defendants suggest that because plaintiff refused back surgery for his pre-existing back injury, at a time previous to the electrocution incident, and allegedly refused to wear a back brace after the electrocution, he failed to mitigate his damages. Defendants have the burden of proving both that plaintiffs actions after the accident were unreasonable and that this unreasonable conduct aggravated his injury. Marathon Pipe Line Co. v. M/V Sea Level II, 806 F.2d 585, 592 (5th Cir.1986). Defendants cite the following testimony from Dr. Lopez in their attempt to sustain this burden of proof:
I,/There were times where he was not doing things in his best interest from a musculoskeletal point of view I would say.
Our review of the record as a whole does not support a finding that the trial court was manifestly erroneous or clearly wrong in failing to find that plaintiff acted unreasonably under the circumstances. The record is replete with evidence that plaintiff was unable to tolerate the pain medication prescribed by Dr. Lopez. There is no evidence that plaintiff was under doctor’s orders either to constantly use a back brace. Likewise, the suggestion that it was unreasonable for plaintiff to refuse to submit to back surgery PRIOR TO the electrocution requires pure speculation on the part of the trier of fact or on our part as a reviewing court. There is no direct testimony that the surgery, which would doubtless have presented its own problems, would have made plaintiff less likely to suffer the damages caused by the electrocution. The evidence quite simply does not compel a conclusion that plaintiff unreasonably declined surgery prior to the electrocution or was unreasonable in his use of the back support thereafter. We find no manifest error in the trial court’s conclusion that the evidence did not support a finding of failure to mitigate damages.
This assignment of error is without merit.
CONCLUSION
Having found no manifest error in the trial court’s determination of the extent of plaintiffs damage and in its determination of the mitigation issue; and having found no abuse of the trial court’s discretion in its award of general damages and apportionment of fault, we affirm the judgment below.
Costs of this appeal are assessed against defendants.

AFFIRMED.

ARMSTRONG, J., DISSENTS WITH REASONS.

. See, LSA-Const. Art. 5, section 10(B).