Lloyd HETRICK and Robert
D. McCavitt, Jr.

v.

AIR LOGISTICS, INC. and Offshore
Logistics, Inc.

No. CIV. A. G–98–230.

United States District Court,
S.D. Texas,
Galveston Division.

July 14, 1999.

Ernest H Cannon, Ernest Cannon & Associates, Houston, TX, for Lloyd Hetrick, Robert D McCavitt, Jr., plaintiffs.

William Thomas Womble, Womble & Cotellesse, Houston, TX, for Air Logistics, Inc., Offshore Logistics, Inc, defendants.

Kenneth Ross Citti, Citti & Crinion, Houston, TX, for Ross Citti, mediator.

### FINDINGS OF FACTS AND CONCLUSIONS OF LAW

KENT, District Judge.

This action came on for bench trial May 10, 1999, concluding May 12, 1999, the Honorable Samuel B. Kent presiding. The Court having carefully considered the oral testimony of all witnesses presented live at trial, the deposition transcript of each witness proffered in that format, all exhibits tendered during the trial, all pleadings, particularly the Pretrial Order, and all relevant attachments, as offered through their respective counsel and the Proposed Findings of Fact and Conclusions of Law, and extensive Trial Briefs, submitted by each of the stated parties, and on the basis of a preponderance of the evidence, and pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, hereby enters its Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. This action arises out of the crash of a helicopter March 4, 1997, after it took off from offshore platform Galveston 313 on a visual flight rules trip to Galveston, and flew into known instrument meteorological conditions. The helicopter had not been equipped for instrument weather. The pilot became disoriented and the aircraft spun into the Gulf of Mexico. The entire flight lasted nine minutes. Liability has been admitted, and no contributory negligence is alleged on the part of either Plaintiff.

2. Plaintiffs Lloyd Hetrick and Robert D. McCavitt, Jr. timely commenced this lawsuit against Offshore Logistics, Inc., which owned and operated the helicopter under the trade name Air Logistics, Inc. under the General Maritime Law for inju-

ries suffered in the crash. Defendants responded timely and this case came on for non-jury trial. The only issues at trial are damages for alleged injuries suffered by each man in the accident. The Court has jurisdiction under 28 U.S.C. § 1333 and Rule 9(h) of the Federal Rules of Civil Procedure. Venue is uncontested.

3. Plaintiff Lloyd Hetrick was a passenger riding next to the pilot in the helicopter. Wearing a radio headset at the time, he was aware of the pilot's decision to risk flying at low altitude into a fog then spreading offshore from Scholes Field, Galveston, their destination. He saw the pilot experience a "brown-out," which is where the Gulf water and the sky no longer can be distinguished by the naked eye. He saw the aircraft spin out of control as the pilot, having lost maneuvering altitude, tried to turn around with insufficient airspeed. Mr. Hetrick heard the pilot say they were in trouble, and he saw the aircraft spinning toward the water. As the aircraft hit the water, it turned upside down and sank. The aircraft's instrument panel, flashing its red and yellow warning lights and sounding its emergency horns, suddenly went silent and dark. The pilot never activated the floats of the helicopter. Mr. Hetrick and the other occupants were spun around, flipped upside down and immersed in only seconds. Mr. Hetrick found himself hanging from his seat belt, immersed in water, gasping for breath. Mr. Hetrick recalled wondering at the time if he was only dreaming. Because he had been trained in survival action, he was able to free himself and exit the flooding cockpit, kicking himself to the surface. There he found the other three passengers and soon thereafter the pilot, each floating by means of their life vests. After a brief discussion, Mr. Hetrick removed his life jacket and made repeated dives back into the helicopter to free the life raft so that the men could get out of the water to avoid hypothermia. The men shivered in the raft. The weather blocked any attempts at search flights. The pilot had not sent out a distress call. The men floated ashore at Surfside Beach, near Freeport, Texas. They had been in the cold, foggy Gulf water for more than three hours.

4. Plaintiff Robert D. McCavitt, Jr. was a passenger in the rear of the aircraft. He knew when the aircraft started spinning around that there was probably going to be a crash. As soon as the helicopter hit the water, he was waist deep. He remembers being upside down in the helicopter, having to undo his seat belt as he hung suspended. He had to exit the passenger door of the aircraft, and kick his way to the surface. He recalls Mr. Hetrick's efforts to recover the raft, and the cold temperature of the water as the men struggled first into the raft and then to get to land wondering if anyone would find them in the fog. Visibility was zero. The men in the raft did not even know if they were drifting toward shore until they heard the breakers pounding the beach.

5. The two men worked for Cockrell Oil Corporation, as high level managers involved in offshore oil production. Neither had ever experienced any spinal injuries, nor pain, prior to this accident, despite the fact that their work often took them offshore in various boats and aircraft, subjecting them to the rigors experienced by operations supervision in that industry.

## A.

## INJURY AND DAMAGES TO MR. HETRICK

6. Mr. Hetrick was born March 1, 1956. He has an ocean engineering degree from Texas A & M University, and has spent about twenty years in the petroleum industry. He has worked for Cockrell since 1994, and was a senior engineer in charge of environmental health and safety at the time of the accident. In his job, Mr. Hetrick travels the Gulf of Mexico from Texas to Mississippi. He testified that on his job, since the accident, he has chronic pain which troubles him daily. His

employer has already made allowances for altering his work regimen. His injuries, he said, have precluded such activities as hard play with his son, or climbing a ladder to change a light bulb, or even making quick left turns in his car. Riding in a bumping boat offshore hurts him as he goes to and from platforms. The pain prevents him from sleeping, unless he takes sleeping prescriptions. He has been unable to perform yard work. He exercises daily, but not to the extent of his pre-accident regimen.

7. Emergency room doctors treated Mr. Hetrick at Brazosport Memorial Hospital near Freeport, where he complained of neck and shoulder pain. He later saw Dr. Tex Cabaniss for neck and back pain. Dr. Cabaniss treated him conservatively and referred him to Dr. Robert Gordon, a neurologist. Mr. Hetrick's complaints were continuing neck and back pain, although he still worked offshore, missing only one day from work after the accident. He saw Dr. Stavinhoa a year after the accident, still complaining of neck pain. Dr. Stavinhoa performed a magnetic resonant imaging (MRI) examination, and diagnosed degenerative disc disease, coupled with a post-traumatic deformity of the neck. Dr. Stavinhoa wanted to perform surgery, but Mr. Hetrick sought a second opinion from Dr. Zoran Cupic, a Houston orthopedist, in whom this Court reposes considerable confidence, who said conservative treatment should still be pursued.

8. Dr. Cupic testified at trial that he found Mr. Hetrick's neck to be limited in its range of motion, and that sudden types of movement in the neck prompt immediate reports of pain. The pain extends into his arms but not to his hands. From the MRI, Dr. Cupic diagnosed a herniated disc at the C5–C6 level of the spine, caused by the helicopter crash the year previous. This herniation is impinging upon nerve roots at that location. Dr. Cupic said this condition is not going to improve without surgery. Two other discs Dr. Cupic have also been found to be bulging, if not already herniated. The bulging discs are also caused by the crash.

9. Dr. Cupic has continued to treat Mr. Hetrick during 1998 and up to the time of trial. He also referred Mr. Hetrick to physical therapy once a week "to make sure he's doing his exercises properly and things like that." He prescribed antiflammants and pain medication and a cervical pillow for sleeping. On September 3, 1998, Mr. Hetrick continued to complain of pain and stiffness in his neck, especially in the morning upon waking, and in the afternoon. Trying to extend his neck to hypertension is "still quite uncomfortable." There is still tenderness in the lower neck and upper thoracic spine along the midline. Flexing his neck forward is also quite uncomfortable. Lateral movement of the neck is also limited. Dr. Cupic has advised him to continue to exercise. Mr. Hetrick thinks his condition had worsened, although perhaps it has "leveled off." Mr. Hetrick continues to take Advil for pain and to perform stretching exercises in the morning to avoid discomfort the rest of the day.

10. On November 2, 1998, Mr. Hetrick complained of more pain, "getting worse now," and requested medication. Dr. Cupic found tenderness at C6–C7, and T–1 levels. He found Mr. Hetrick's range of motion of the cervical spine definitely reduced "somewhat." He also noted tenderness and discomfort in the upper thoracic spine, mainly in the mid-line. Dr. Cupic again prescribed a cervical pillow and Ultram for pain and inflammation. Dr. Cupic suggested neuromuscular therapy, since conventional therapy did not appear to be obtaining satisfactory results, saying "In fact, he is getting worse."

11. On April 20, 1999, Mr. Hetrick again saw Dr. Cupic. His medication at that time was 200 milligrams of Celebrex which "seems to be helping quite a bit." He was also supplementing this medication with Advil. Dr. Cupic warned him about dangers of overmedication. Range of motion was still "somewhat reduced."

Lateral motion was "somewhat limited and painful." Dr. Cupic suggests continued exercise.

12. Dr. Cupic testified that Mr. Hetrick will require continuing medical attention in the future, and that surgery on the neck was probably necessary in the future to fuse the neck when conservative measures no longer worked. This surgery would cost a reasonable and necessary $35,000 to $40,000 if conducted today. Conservative reasonable and necessary treatment until then would cost on average $1,000.00 to $1,500 a year. The surgery in all reasonable, medical probability would be necessary in five to ten years, Dr. Cupic said. After that surgery, Mr. Hetrick's ability to do any heavy work would be impossible. This surgery would be not only for the C5–C6 level, but for the other two bulging/herniated areas, as well.

13. Even without the surgery, Dr. Cupic believes the neck condition would limit Mr. Hetrick's ability to work offshore, since trips more often than once a month "would be a little bit too much for his neck." The further offshore Mr. Hetrick would have to work, the more difficult each trip would be on him. Dr. Cupic also believes that Mr. Hetrick's condition will definitely worsen as he ages.

14. The surgery contemplated by Dr. Cupic is an anterior operation, from the front of the throat, back to reach the spine. Such surgery is routine, but requires shifting all tissue and organs in the throat in order to reach the spine. Dr. Cupic said even without surgery, Mr. Hetrick has definite limitations on his work activities.

15. Dr. Leland Winston, a Houston orthopedist, whom this Court has known for almost forty years, saw Mr. Hetrick for a medical examination requested by the defense. He testified that in September 1998, he reviewed the MRI and found herniations at C4–C5, C5–C6 and C6–C7 levels of the neck. Dr. Winston did not believe the herniations were disabling. Nor did Dr. Winston know when these herniations had developed, although the pre-accident history did not support any existence of them. He did not recommend surgery at present, but he did admit future surgery was at least possible, if not "50/50." He did not believe Mr. Hetrick would have a shortened work life expectancy. He did agree that pain can be disabling, and that Mr. Hetrick suffers from pain and probably will for the rest of his life. Most of his patients with neck pain complain of long rides in a car, and most especially of long rides in boats. Going offshore will cause Mr. Hetrick pain, and the issue of work life will depend upon whether he can stand the pain enough to work, Dr. Winston said. He ascribed Mr. Hetrick's pain and condition to the crash of the helicopter. He said Mr. Hetrick has lost 20 percent of the range of motion in turning his head or leaning his head forward. Generally, patients with this condition encounter more pain and disability as they get older, he said. While some disc herniations may heal without surgery, he said, repeated trauma to the disc will mean the disc condition will worsen. Significantly, Dr. Winston said that he did not rule out Dr. Cupic's recommendation of surgery. "There's a huge gray area in the spine, a huge gray area," he said. Indeed, he noted that doctors of equal competence can differ widely in their opinions, even opining that if ten doctors were called, the Court could expect ten opinions. The disc problem at C4–5 affects the right exiting foramina, the small opening where the nerve roots exit to the extremities. Dr. Winston said he did not believe surgery would limit Mr. Hetrick's work life expectancy more than three months and that it would not limit his work activities.

16. Mr. Hetrick offered no vocational rehabilitation testimony, but the defense did, through Dr. Carl Hansen, a rehabilitation counselor. In his opinion, if the Court finds Mr. Hetrick to be even moderately disabled, Dr. Hansen said Mr. Hetrick has at least 4.8 years of reduction of work-life expectancy.

17. Dr. Hansen noted that Mr. Hetrick's annual income is normal for the offshore oil industry, but relatively high when compared to land-based work. Labor statistics report that earnings of $103,000 to $133,000 are expected in Mr. Hetrick's field, and these statistics are borne out by Mr. Hetrick's actual earnings.

18. Two economists, both well-known to this Court, testified. Dr. Kenneth McCoin, Plaintiff's economist, measured Mr. Hetrick's loss of earning capacity by comparing his annual rate of pay ($120,000), factoring inflation, adding 11 percent for fringe benefits, and factoring in a loss of 4.8 years of work-life capacity. He testified that the after-tax economic loss on that basis would be $535,880. He added $41,790 for loss of household services in the future. Past household services lost were $2,717. This is based upon a true discount rate in the future of 1.4 percent.

19. Dr. Don Huddle, Defendants' economist, measured Mr. Hetrick's loss of earning capacity at $357,646, if this Court were to accept the predictions of Mr. Hetrick's future disability and surgery. The difference between Dr. Huddle's opinion and Dr. McCoin's is simple: Dr. Huddle deducted five percent of gross earnings annually as a work expense, whereas Dr. McCoin deducted $100 per month (about 1 percent); Dr. Huddle assumed no loss of household services; and Dr. Huddle used a discount rate of 2.2 percent.

20. Each economist expressed specific adherence to the teachings of *Culver II* in making their final calculations. The opinions of each would show that Mr. Hetrick suffered future earnings loss, in view of a 4.8 year work life diminution.

21. The Court finds that the physicians involved in this case have thoughtfully and fairly striven to bring all facts to light surrounding Mr. Hetrick's medical condition. There is no question he suffered an injury in the crash. All agree. There is likewise no question that he has suffered continuing pain, loss of sleep, and discomfort as a result. The doctors do not question *whether* he suffered a herniated disc in his neck, but rather *how many* he suffered. The only real question is: "What should be done in the future about the herniations?" The answer to that question determines how the Court should apply the opinions of the rehabilitation and economic experts.

22. The defense points out that the Plaintiff has continued to work in his usual job, and that he has suffered to date no real loss of earnings, indeed missing only *one day* of work. This is true. But it is also true, based upon all medical testimony, that Mr. Hetrick has continued to work, traveling offshore, in constant pain, and with the constant anxiety of what to do about that pain, and of what work limitations his neck will cause him. In fact, the latest visits to Dr. Cupic indicate Mr. Hetrick's condition does not appear to be improving, but rather is worsening.

23. While Dr. Winston testified that Mr. Hetrick's cervical herniations *might* go away on their own, he could not say they probably would. In view of recommendations of a treating doctor (Dr. Cupic) that surgery is probable within the next five to ten years, and in view of the previous recommendation for surgery by Dr. Stavinhoa and in view of Dr. Winston's appreciated candor that surgeons can differ in this "gray area" of the neck, the Court finds that future surgery is reasonably probable, and that a shortened work-life expectancy of 4.8 years is reasonably probable.

24. The Court finds that Dr. McCoin's calculations are a little high and Dr. Huddle's about right. The Court will accept Dr. Huddle's views, report and testimony as truly reflecting Mr. Hetrick's loss. The Court finds that the present value of Mr. Hetrick's lost future earnings is $325,000.

25. The Court finds that Mr. Hetrick has suffered mental anguish proximately caused by the accident. He has

worried about his post-accident recovery, his future work-life expectancy, and whether he should undergo cervical surgery already recommended by one of his treating physicians. In addition he suffered mental anguish in the accident itself, as he feared the aircraft's impending impact with the water, struggled to free himself from the wreckage, and, at the risk of his own life, doffed his life jacket to dive again into the helicopter to retrieve the life raft stored there. He, with the others, suffered the cold offshore winds drifting in the Gulf until rescue. He wondered how, when, even if rescue would come. The Court finds that pain and suffering and mental anguish in the past proximately caused by the accident totals $100,000, and in the future, as he ponders the pending surgery and the consequent diminished work life expectancy, pain and suffering and mental anguish proximately caused by the accident totals $100,000.

26. The Court finds that future reasonable and necessary medical expenses proximately caused by the accident total $86,500, representing $40,000 in future surgery costs, and $1,500 per year additional over 31 years.

27. The Court finds that Mr. Hetrick's future life expectancy is 31 years, and that his past and future loss of household services during his lifetime proximately caused by the accident, discounted to present value is $13,500.

28. The Court finds, therefore, that Mr. Hetrick has suffered total damages, past and future, of $625,000.

## B.

### INJURY AND DAMAGES TO MR. McCAVITT

29. Mr. McCavitt was born November 23, 1953. He received a civil engineering degree in 1975 from Pennsylvania State University and has also worked in the petroleum industry for more than 20 years. He was operations manager for Cockrell Oil Corporation at the time of the accident, earning about $157,000 per year.

30. Emergency room doctors treated Mr. McCavitt at Brazosport Memorial where he complained of low back and neck pain. Evidence of a disc space narrowing at the L5–S1 level of his spine showed up at that time. He also saw Dr. Cabaniss, who treated him conservatively and referred him to Dr. Gordon for a neurological consultation. These doctors were engaged by Cockrell's worker's compensation carrier, and there appears nothing unusual about the number of physicians, nor the specialty practices, involved. At the time of the neurological evaluation in August 1997, Mr. McCavitt was complaining of intermittent back pain. Dr. Gordon described the complaint as "one of mild, low-grade back pain," which did not prevent Mr. McCavitt from working. Mr. McCavitt was actively exercising, as his doctors had recommended. Since about May 1, 1997, Mr. McCavitt has noticed "funny" feelings on the left side of his body. These are sensations of numbness, tightness and weakness. The sensations were not, as of August 1997, a major problem, nor incapacitating, although the pains he felt were worse in his left leg. He was also experiencing pain in his left arm, and possibly his face. He was not on medication at the time. Dr. Gordon diagnosed a "lumbar strain" as a result of the helicopter crash. He recommended an evaluation of the "left-sided fatigue or heaviness" sensations. Mr. McCavitt continued to deal with his pain and other symptoms until February 1998, when, like Mr. Hetrick, he also consulted Dr. Zoran Cupic. He testified he went to Dr. Cupic because the pain in his back was persisting, as was the numbness in his lower left leg. His condition did not seem to be improving, and medication was only a short-term relief. Dr. Cupic had previously treated Mr. McCavitt's family, and the Court finds this consultation understandable, given the recurrent symptoms.

31. At trial, Dr. Cupic testified that Mr. McCavitt had two areas of complaint, his neck and his low back. Dr. Cupic found the neck to have a reduced range of motion and "a lot of tenderness" in the muscle masses on either side of the neck. Dr. Cupic also found problems with Mr. McCavitt's low back—the straight leg raising test was positive on the left side at 60–degree level. "So more of the pain was going to the left side obviously." Dr. Cupic continued to treat Mr. McCavitt conservatively, with medication, anti-inflammatory and for relief of muscle spasm.

32. Dr. Cupic's records, introduced at trial, show the course of treatment undergone by Mr. McCavitt. On September 15, 1998, Mr. McCavitt stated his neck and low back pain was intermittent, but *daily*. The neck and low back areas were tender, the left leg raising test still positive on the left side at 70 to 80 degrees. It was decided he should try to do without medication, which he had been taking for pain. Dr. Cupic prescribed walking as an exercise.

33. On October 27, 1998, Mr. McCavitt returned to Dr. Cupic, complaining of continuing pain and discomfort going down into his left leg. The leg-raising test was now negative, although Mr. McCavitt reported some discomfort in the 70–80 degree range. His neck was now bothering him more, on both sides of the neck, There was pain and tenderness in the neck, and now in the trapezius muscles. Dr. Cupic prescribed anti-inflammatory medication and scheduled an MRI of the neck.

34. On December 2, 1998, Dr. Cupic saw Mr. McCavitt, who still complained of discomfort in the neck on both sides, and definitely in the muscle masses. There was now tenderness in the mid-line of the neck. Dr. Cupic reviewed the MRI with Mr. McCavitt: It had shown a "left disk protrusion at C5–C6 and . . . some impingement of the C6 nerve root on the left side." The MRI of the low back "revealed degeneration at L5–S1. He is still symptomatic in that particular area as well." The

symptoms of pain and discomfort were traceable to the accident.

35. On January 20, 1999, Mr. McCavitt returned, again complaining of the low back and neck. The lumbar area was "slightly worse, but it has been worse all along." Mr. McCavitt was making "some progress, however." Previously, there had been periods when Mr. McCavitt would be experiencing three to four days of "quite a lot of pain and discomfort in his low back. These days are gone." But there was continued discomfort in the low back on both sides "all the time." In the cervical area, Dr. Cupic still noted some tenderness in the muscle masses on both sides of the neck. Dr. Cupic warned him about possible over-medication and prescribed exercise.

36. On April 23, 1999, Mr. McCavitt again saw Dr. Cupic. The neck still bothered Mr. McCavitt, "but not constantly." Range of motion of the neck was still "somewhat reduced, but mainly because of pain." The low back, however, had gotten worse. There was tenderness in the lumbosacral area, in the mid-line and over both sacroiliac joints. Mr. McCavitt had been taking Celebrex, an anti-inflammatant, which had helped "to a degree." However, his back continued to bother him. Dr. Cupic changed medications and continued to prescribe exercise. This was in part to relieve the radicular pain now going with the left lower leg.

37. Meanwhile, Dr. Cupic had referred Mr. McCavitt to physical therapy. The records of this therapy are in evidence. They show repeated symptoms noted by the therapists, basically tracking those already appearing in Dr. Cupic's records: On February 23, 1998, the therapist noted that, since no doctor had previously prescribed therapy, "chronic pain symptoms are expected." Mr. McCavitt was advised to "avoid any heavy lifting or impact loads. Must not sit for longer than 30—40 mins. Has to get up to relieve LB discomfort." On March 10, 1998, the therapist noted

Mr. McCavitt's complaints of pain in his low back and neck. On March 18, 1998, Mr. McCavitt's level of physical function was rated at only 90%. His symptoms of radicular pain were unchanged. On June 2, 1998, the therapist noted Mr. McCavitt's prognosis as "fair" on achieving the original goals, which was to increase his range of motion 50 percent from the first visit, to improve the tightness in his left hip, to increase his endurance, and to improve the radicular pain in his left foot.

38. At trial, Dr. Cupic testified the physical therapy was not really successful: "[He] has gotten better and worse. It just depended." Dr. Cupic said the MRI of the low back had not shown a herniation, although it had shown "quite severe" degeneration. The MRI of the neck had shown "a big protrusion" at level C5–C6 of the neck, which "seems to be impinging on the nerve root at C6 on the left side, which is where the symptoms are." Dr. Cupic's diagnosis of Mr. McCavitt as of trial was:

a. A degenerative disk disease of the low back, which had not been symptomatic of pain or discomfort prior to the accident. Dr. Cupic believed this area became symptomatic as a result of the accident;

b. A herniated disk at the C5–C6 level of the neck, also a result of the crash. Both of these conditions had caused pain to Mr. McCavitt in the past, and both had limited his physical activities. The physical limitations included not being able to bend as much as before, stoop, or lift, or work in the yard.

39. Dr. Cupic testified that Mr. McCavitt, like Mr. Hetrick, will require neck surgery in the future, to include an excision of the disc and a fusion of the spine. The low back Dr. Cupic believed could continue to be treated conservatively. Even so, Dr. Cupic said that Mr. McCavitt would continue to suffer pain in the future, for the rest of his life, as a result of the helicopter crash. Surgery on the neck, Dr. Cupic said, would do away with some pain in the neck area. He was delaying surgery as long as medically reasonable, but again stated he would probably operate within five to ten years. Post-surgery, Mr. McCavitt's limitations would be similar to those now placed upon him: He would be able to perform a desk job, but would be unable to go out to an offshore platform and perform his typical job. The future surgery would cost about $30,000, and the cost of conservative care would be "around $1,500 a year."

40. At trial, Mr. McCavitt testified that he continues to experience low back pain and neck pain, although the neck pain is "more sporadic," every few days. He experiences numbness just below the left knee. He had not experienced these symptoms before the crash. He now has a constant pain in his low back, which fluctuates in intensity, but always with a dull ache. Standing or sitting for any length of time makes the pain worse. Exercise and medication provide short-term relief. He avoids any activity at work or at leisure which may prove too strenuous for him.

41. Typically he now goes offshore every three to four months, instead of every month or two at the time of the crash. This is because going offshore is "a more painful experience now.... I can't really get comfortable after you're sitting for a while so there's pain from that." He now prefers to go by boat instead of helicopter, so that he does not have to face the possibility of another crash. The bumping of a boat, however, aggravates his pain in the back. On an offshore oil rig, being on his feet an extended period of time causes him pain. Being less able to work offshore would negatively impact his future job prospects. Prior to the accident, he would jog about a half hour daily. After the accident he just walks.

42. Dr. Winston also examined Mr. McCavitt on September 10, 1998 for the defense. He testified Mr. McCavitt complained of pain in his low back, occasionally extending into the rear of the left thigh. Mr. McCavitt said his leg felt "a little bit

asleep." He also complained of soreness in his neck. He found no limits on range of motion of the neck and no tenderness over the low back. Dr. Winston described Mr. McCavitt as a normal, healthy 44–year–old man. To Dr. Winston, the X-rays previously taken of Mr. McCavitt "were not very good quality, but they appeared negative." The February 1998 lumbar MRI was "essentially negative," with "no lumbar stenosis and no focal disk herniation." Dr. Winston found no weakness in the legs, no pain radiating into the legs, and concluded that the low back had suffered "a lumbar strain but no severe injury." This lumbar strain, he said, was "mild to moderate." Mr. McCavitt's complaints according to Dr. Winston, were not debilitating, and he did not believe Mr. McCavitt was disabled. Dr. Winston did not believe the crash would shorten Mr. McCavitt's work life, and did not see any need for surgery.

43. Dr. Winston's testimony, of course differs greatly from Dr. Cupic's. Dr. Winston admitted, on cross-examination, that the radiologist who conducted the MRI had found "a defused disk bulge [which] does indent the ventral thecal sac at L5–S1." He said he had thought a bulging disc on the MRI was a "normal" condition, so he had described the MRI as "normal." The radiologist had also reported "severe spondylosis" [degenerative arthritis] at L5–S1. Such a condition at L5–S1 would explain the pain in the left thigh reported by Mr. McCavitt, Dr. Winston testified. Of real interest, Dr. Winston also testified that the spondylosis at L5–S1 could have been caused by the helicopter crash, since sufficient time had elapsed between the accident and the MRI for the condition to have developed. The Court also notes that Dr. Winston, in his September 16, 1998, examination of Mr. McCavitt, did not have the benefit of the cervical MRI performed October 7, 1998 by Dr. Cupic. This is the MRI by which Dr. Cupic was able to diagnose the cervical herniation. Dr. Winston did not have it because no one had provided him with a copy prior to trial.

44. Dr. Carl Hansen, the defense rehabilitation counselor, testified in a similar manner to Mr. Hetrick's case: If the Court finds the existence of a disability, Mr. McCavitt has suffered at least 4.5 years of reduced work life expectancy.

45. Dr. Hansen found Mr. McCavitt's income, like Mr. Hetrick's, to be as expected in offshore oil management, again borne out by actual earnings.

46. Again the Court heard the two economists on the effect of Mr. McCavitt's condition upon future earnings. Dr. McCoin, using the same formula as with Mr. Hetrick, arrived at an economic loss of $640,826, after taxes. This was based upon: a work-life expectancy (if uninjured) of 18 years; a projected 4.5 year reduction in work-life expectancy; 11 percent fringe benefits annually; income increases based on merit and projected inflation; $100 per month expenses related to work; discount rate of 1.4; base salary of $157,000; life expectancy of 31.5 years; and a 20–percent loss of household services, to which Mr. McCoin attributed a value of $26,801 in the future and $1,811 in the past. Dr. Huddle's opined losses of $397,581, after factoring *five percent* ($8,714 annually) for work-related expenses, nothing for household services, and after discounting at a rate of 2.2 percent. Both economists in their presentations invited the Court to consider extremes of economic loss—Dr. McCoin in suggesting a 50 percent loss to future work capacity, and Dr. Huddle a zero loss. Significantly, both considered the 4.5 year future loss suggested by Dr. Hansen as the starting point for their presentation. Considering the medical status discussed herein, and the Court's findings in that regard, the Court finds the 4.5–year work-life reduction to be a reasonable prediction. The Court further finds that Dr. Huddle more accurately states Mr. McCavitt's economic losses.

47. The Court is troubled about the medical testimony, primarily because Dr. Winston did not have the benefit of the

cervical MRI, which forms the foundation of Dr. Cupic's diagnosis. The Court finds Dr. Winston was honest and forthright in his answers on cross-examination, (as always), for example when he acknowledged that the spondylosis, however "normal," would tend to explain the low back pain reports, and then went on to testify that the spondylosis may have resulted from the crash. The Court appreciates this testimony, since the Court finds that the lower back pain, asymptomatic before the crash, certainly became symptomatic as a direct and proximate result of the crash.

48. Likewise, the Court finds: Dr. Cupic's diagnosis of a cervical herniation at C5–C6, also related to the crash, to be credible; the future surgery described to be reasonable and medically probable; the existence of a disability already affecting Mr. McCavitt's work; and the 4.5 year diminished work life expectancy described in Dr. Hansen's report and testimony.

49. The Court finds that the total economic losses sustained by Mr. McCavitt proximately caused by the accident total $375,000.

50. The Court finds that Mr. McCavitt has suffered mental anguish proximately caused by the accident. He has worried about his post-accident recovery, his future work-life expectancy, and whether and when he should undergo cervical surgery. In addition he suffered pain and suffering and mental anguish in the accident itself, as he sensed the impending impact with the water, freed himself from the wreckage, and, shivered in the life raft awaiting non-existent rescue efforts, worried that the raft was drifting not toward shore, but out to sea. The Court finds that pain and suffering and mental anguish in the past should be compensated at a level of $100,000, and in the future, as he ponders the pending surgery and the consequent diminished work life expectancy, at a level of $85,000.

51. The Court finds that future reasonable and necessary medical expenses, on the same basis as Mr. Hetrick, total $76,500.

52. The Court finds that Mr. McCavitt's future life expectancy is 31 years, and that his past and future loss of household services during his lifetime is $13,500.

53. The Court finds, therefore, that Mr. McCavitt has suffered total damages, past and future, of $650,000.

54. "Under maritime law, the awarding of prejudgment interest is the rule rather than the exception, and, in practice, well-nigh automatic." *Reeled Tubing, Inc. v. M/V CHAD G*, 794 F.2d 1026, 1028 (5th Cir.1986). A Trial Court only has the discretion to deny prejudgment interest where the peculiar circumstances would make such an award inequitable. *Id., citing Inland Oil & Transport*, 696 F.2d at 327. In this Circuit, prejudgment interest is usually awarded to the date of loss to ensure that the injured Plaintiff is compensated for the use of funds to which the Plaintiff was entitled, but which the Defendant had use of prior to Judgment. *Reeled Tubing, Inc.*, 794 F.2d at 1028.

55. The Court also has broad discretion in setting the rate of prejudgment interest. *Reeled Tubing, Inc.*, 794 F.2d at 1029. In setting the rate of prejudgment interest as to past damages, the Court appropriately may look to reasonable guideposts, including the interest rates set forth in 28 U.S.C. § 1961 for judgments. *Reeled Tubing, Inc.*, 794 F.2d at 1029. The Fifth Circuit has previously approved, taking into account the equities involved, application of the rate prevailing under 28 U.S.C. § 1961 at the time the loss occurred, in this case March 4, 1997. *Id.* Taking judicial notice of the prevailing rate for March 4, 1997, the Court finds the most equitable rate of prejudgment interest would be 5%. 28 U.S.C. § 1961. Accordingly, the Court finds and awards on all damages accrued through the entry of

Judgment prejudgment interest to run at 5%.

## CONCLUSIONS OF LAW

1. At the time of their injuries on March 4, 1997, Plaintiff Lloyd Hetrick was a senior engineer in charge of environmental health and safety for Cockrell Oil Corporation and Plaintiff Robert D. McCavitt, Jr. was operations manager for Cockrell Oil Corporation. This Court has jurisdiction pursuant to 28 U.S.C. § 1333, and Fed. R. Civ. Proc. 9(h). Venue is uncontested.

2. The injuries sustained by Plaintiffs Lloyd Hetrick and Robert D. McCavitt, Jr., as described in the Court's Findings of Fact, were proximately caused by the uncontested negligence of Defendants Air Logistics, Inc. and Offshore Logistics, Inc., and such negligence was a legal and factual cause of Plaintiffs' injuries. *Kanischer v. Irwin Operation Co.,* 215 F.2d 300, 303 (5th Cir.1954), *Cert. Den.* 348 U.S. 942, 75 S.Ct. 363, 99 L.Ed. 737 (1955). No contributory negligence on the part of either Plaintiff has been alleged. Consequently, Defendants are completely liable, jointly and severally, to Plaintiffs for their damages sustained as a result of the subject incident, including loss of wages and benefits in the past and loss of net future earning capacity, reasonable costs of necessary medical and hospital care in the future, physical pain and suffering including physical disability, impairment, inconvenience, the effects of Plaintiffs' injuries upon the normal pursuits and pleasures of life, and mental anguish, both past and future, and past and future loss of household services, as calculated in the Court's Findings of Fact. *See Williams v. Chevron,* 875 F.2d 501, 506 (5th Cir.1989). The future losses must be discounted. *Culver v. Slater Boat Co.,* 722 F.2d 114, 117 (5th Cir.1983). Future lost income must also reflect adjustment to net, after-tax value. *Norfolk and W. Ry. v. Liepelt,* 444 U.S. 490, 493–94, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980).

3. This was an admiralty action tried without benefit of a jury, pursuant to the Court's admiralty jurisdiction, invoked by Fed. R. Civ. Proc. 9(h). Accordingly, an award of interest is proper in the sound discretion of the Court. *Marathon Pipe Line Co. v. M/V Sea Level II,* 806 F.2d 585, 593 (5th Cir.1986). The Court finds that an award of pre-judgment interest is proper in this case, at the rate of 5% per annum, on Plaintiffs' past damages, as provided and described in the Court's Findings of Fact.

4. On the basis of the foregoing Findings of Fact, Plaintiff Lloyd Hetrick has sustained damages in the amount of $625,000, inclusive of all past and future losses, together with pre-judgment interest on past losses, together with interest on the entire Judgment, until satisfied, at 5% per annum.

5. On the basis of the foregoing Findings of Fact, Plaintiff Robert D. McCavitt, Jr. has sustained damages in the amount of $650,000, inclusive of all past and future losses, together with pre-judgment interest on past losses, together with interest on the entire Judgment, until satisfied, at 5% per annum.

6. To the extent any Finding of Fact constitutes a Conclusion of Law, the Court hereby adopts it as such. To the extent any Conclusion of Law constitutes a Finding of Fact, the Court hereby adopts it as such.

IT IS SO ORDERED.

## FINAL JUDGMENT

For the reasons set out in the Court's Findings of Fact and Conclusions of Law, entered this date, in the instant cause, and pursuant to Federal Rule of Civil Procedure 58, Judgment is hereby rendered in favor of Plaintiffs on their maritime negligence claims. Pursuant hereto, Plaintiff Lloyd Hetrick shall have and recover of and from Defendants Air Logistics, Inc. and Offshore Logistics, Inc. jointly and

severally, the total amount of $625,000, together with his taxable costs of court, and pre- and post-judgment interest at the rate of 5% percent per annum, for which let execution issue, if not timely paid. Plaintiff Robert D. McCavitt, Jr. shall have and recover of and from Defendants Air Logistics, Inc. and Offshore Logistics, Inc. jointly and severally, the total amount of $650,000, together with his taxable costs of court, and pre- and post-judgment interest at the rate of 5% percent per annum, for which let execution issue, if not timely paid.

ALL RELIEF NOT HEREIN EXPRESSLY GRANTED IS DENIED.

THIS IS A FINAL JUDGMENT.