**MARATHON PIPE LINE COMPANY, et al., Plaintiffs-Appellees,**

v.

**M/V SEA LEVEL II, et al., Defendants-Appellants.**

v.

**OCEANONICS, INC., Defendant-Appellee.**

No. 86–3038.

United States Court of Appeals, Fifth Circuit.

Dec. 23, 1986.

Rehearing and Rehearing En Banc Denied Jan. 21, 1987.

586

Arden J. Lea, David J. Plavnicky, New Orleans, La., for Sea Level Intern., Inc. & C.S.I., etc.

Jerrold B. Peterson, Montgomery, Barnett, Brown & Read, Henry J. Read, A. Gordon Grant, Jr., New Orleans, La., for Marathon & Hess.

R.K. Christovich, New Orleans, La., for Oceanonics.

Before CLARK, Chief Judge, WISDOM, and HIGGINBOTHAM, Circuit Judges.

CLARK, Chief Judge:

Defendants Sea Level International, Inc. (Sea Level), and C.S.I. International, Inc. (C.S.I.), appeal the judgment of the district court finding them liable for damages sustained to a pipeline owned by the plaintiff, Marathon Pipe Line Company (Marathon). Sea Level and C.S.I. contend that co-defendant Oceanonics, Inc. (Oceanonics), is contractually obligated to indemnify them for their liability stemming from the pipeline damage. Sea Level and C.S.I. also contend that the district court failed to make material findings regarding Oceanonics' contractual duties and duty to exercise reasonable care. Finally, Sea Level and C.S.I. contest the amount of damages claimed by Marathon and awarded by the court and the award of prejudgment interest. We affirm the judgment of the district court in all respects.

## I. Background

In July 1983, Texas Eastern Transmission Corporation (TETCO) commenced work on a project to change the protective system guarding one of its natural gas pipelines in the Gulf of Mexico. TETCO contracted with Sea-Con Services, Inc. (Sea-Con), to perform the necessary construction work. Sea-Con, in turn, secured the services of the workboat M/V SEA LEVEL II to transport material and personnel and to function as a work platform for the construction project. The SEA LEVEL II was owned and operated by appellants Sea Level and C.S.I.

TETCO's pipeline was connected to the northeastern side of a fixed platform located in East Cameron Block 321. Marathon also owned two pipelines connected to the same fixed platform. The pipeline that ultimately sustained the damage ran in a southeasterly direction along the Gulf floor. TETCO contracted with Oceanonics to locate all submerged pipelines in the vicinity of the platform and mark them with buoys. Before the SEA LEVEL II arrived at East Cameron Block 321, an Oceanonics survey crew, aboard the M/V RAINDROP, located and marked the pipelines in the area with styrofoam buoys dropped at 500 to 800 feet intervals along the pipeline routes.

The SEA LEVEL II arrived at the platform site on July 2, 1983. Peter McCormick, the Oceanonics employee responsible for locating and marking the pipelines, boarded the vessel to confer with the SEA LEVEL II's captain, Gerald Turner, about the location of the various pipelines. Turner then set out the SEA LEVEL II's four anchors in the vicinity of the platform without incident.

It was later decided that the vessel should be repositioned. On the morning of July 3, 1983, McCormick boarded the SEA LEVEL II in order to discuss the repositioning of the vessel. Representatives from both TETCO and Sea-Con were also present. Turner advised McCormick and the other representatives that the vessel had to be repositioned in such a way that one of the vessel's anchors would cross one of Marathon's pipelines. Turner asked McCormick to verify the position of one of the buoys, which he estimated was 400 feet away from the SEA LEVEL II. McCormick advised against dropping the anchor so close to the pipeline, since it was Oceanonics' policy, for safety purposes, to maintain a distance of at least 1,000 feet be-

tween a pipeline and an anchor when the anchor line crossed the pipeline. Despite McCormick's advice and Turner's own concern regarding the placement of the anchor, Turner decided to position the anchor across the pipeline at this location.

Shortly after the anchors were set, work ceased on the construction project and the SEA LEVEL II was ordered to return to shore for supplies. Turner ordered the retrieval of the four anchors. The crew raised three of the anchors routinely, but could not retrieve the fourth which had been dropped across Marathon's pipeline. After much speculation as to what was causing the problem and several unsuccessful attempts to winch the anchor aboard, the anchor cable was cut.

On July 20, 1983, Marathon commissioned a sidescan sonar of the seabed in the vicinity of the lost anchor. The sidescan sonar confirmed that the anchor was lodged in Marathon's pipeline and further indicated that 400 feet of the pipeline had been displaced from its trench to a maximum distance of 25 feet. On August 9, 1983, Marathon sent a diver down to inspect the damaged portion of the pipeline and to conduct ultrasonic testing at various locations along the displaced portion. During the course of this inspection, the diver found damage to the protective coating of the pipeline. The diver further reported finding two "flat spots" along the displaced portion of the pipeline. Finally, on August 16, 1985, Marathon retained Brown and Root, a survey firm, to perform a stress analysis on the pipeline with respect to its relocation and displacement. As a result of its analysis, Brown and Root concluded that the pipe had exceeded its yield strength during the movement. Brown and Root verbally recommended that some 60 feet of the pipeline be replaced.

Based in large part on this report, Marathon decided to replace rather than repair the damaged pipeline. It further decided to replace the entire 400-foot section of the pipeline displaced by the anchor rather than replace only the 60-foot portion and incur the additional expense of repairing the coating damage along the remaining portion.

The district court found that defendants TETCO and Sea-Con were not liable for the damage to the pipeline and that Oceanonics was not responsible for Marathon's damages. It found that Oceanonics was hired only to locate and mark the pipelines, not to place the SEA LEVEL II's anchors. The court reasoned that if Oceanonics had to place the anchors, the cost would have been greater, more sophisticated equipment would have been used, and Oceanonics would have taken control of the vessel and given the order where to position the anchors. The court noted that Captain Turner gave the order to drop the anchor based on his own decision, and found that any advice on McCormick's part with respect to the proper positioning of the anchors was gratuitous. In addition, the court observed that McCormick expressed his disapproval of the planned anchoring operation.

With respect to the amount of damages, the district court found Marathon's decision to replace the entire 400-foot segment of the pipeline to be reasonable under the circumstances. The court thus awarded Marathon the total amount it had expended in replacing the damaged segment, which was $530,607.67. The court also awarded prejudgment interest from the date of the casualty.

Sea Level and C.S.I. appeal the judgment with respect to both liability and damages.

## II. Cross-Claims Against Oceanonics

Sea Level and C.S.I. raise a variety of issues in their attack on the district court's holding that Oceanonics was not responsible for the pipeline damage. They contend that the court erred in characterizing McCormick's advice on the positioning of the SEA LEVEL II's anchors as "gratuitous." They assert that Oceanonics' activities with respect to the anchor placement were subject to the provisions of the TETCO/Oceanonics contract. They argue that, since the activities were within the scope of the contract, the contract obligated Oceanonics to indemnify Sea Level and C.S.I., as

subcontractors of TETCO, for all accidents including property damage "occurring in connection with, arising out of, or in any wise incident or related to" Oceanonics' services under the contract. Sea Level and C.S.I. interpret this indemnification language as broad enough to obligate Oceanonics to indemnify them even if McCormick's assistance in placing the anchors was properly characterized as gratuitous and not directly required by the contract. Sea Level and C.S.I. also contend that Oceanonics breached its contractual warranty to perform its services in a workmanlike manner and that the court erred by failing to consider this issue. Similarly, they claim the court erred by not making material findings with respect to whether Oceanonics breached its contractual duty to "maintain" the buoys in an accurate position and whether, assuming McCormick's advice was gratuitous, McCormick failed to render such advice with reasonable care.

### A.

The district court found that it was the duty of Captain Turner to position the anchors and that Oceanonics was not contracted to place the anchors. The court found that Turner was negligent in performing his duty—that he knew or should have known of the risks involved in placing one of his anchors across Marathon's pipeline. It was Turner's negligence that caused the damage. This was the basis for imposing liability on Sea Level and C.S.I.

■ On appeal the findings of the district court are not to be set aside unless clearly erroneous. Fed.R.Civ.P. 52(a); *Pullman-Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982); *McAllister v. United States,* 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954); *Williams v. Reading & Bates Drilling Co.,* 750 F.2d 487, 489 (5th Cir.1985). The court's finding that Turner was negligent and that this negligence was the sole cause of the pipeline damage finds much support in the record and is not clearly erroneous.

■ Oceanonics' contract with TETCO contains a warranty that services under the contract will be done in a workmanlike manner. Sea Level and C.S.I. argue that the district court failed to consider whether Oceanonics breached this warranty of workmanlike performance. The problem for this contention is that the district court correctly found that Oceanonics did not undertake any services that caused the damage here. The sole basis for liability was Turner's negligent decision to position the anchor across the pipeline. Implicitly, the district court found that any alleged breach of Oceanonics' warranty of workmanlike performance could not have caused the pipeline damage. This finding is not clearly erroneous.

Sea Level and C.S.I. next argue that Oceanonics was contractually obligated to maintain the buoys in an accurate position. They assert that the court misinterpreted Oceanonics' duty under the contract to maintain the buoys when it stated that Oceanonics was hired by TETCO "to simply locate and mark the pipelines in the vicinity." Because the court did not recognize this contractual duty, they contend, the court made no factual finding as to Oceanonics' alleged failure to maintain the markers in an accurate position. Oceanonics counters that there was no evidence presented at trial to show that Oceanonics failed to maintain the buoys accurately. Sea Level and C.S.I. respond that Turner dropped the anchor 400 feet away from a buoy and that the anchor latched onto the pipeline. They assert that this occurrence by itself is sufficient to show that the marker was either misplaced or inaccurately maintained.

■ Sea Level and C.S.I. once again ignore the express holding of the district court that Turner's negligence caused the damage to the pipeline. Even if the buoy markers were not accurate, Turner knew or should have known of the risks involved in placing the anchor across Marathon's pipeline. The court's finding that McCormick advised against placing the anchor across the pipeline and that he recommended it be placed at least 1000 feet away

from the line supports the court's finding of fault. Turner took the risk of not insisting upon a clearance greater than 400 feet, and this negligent decision to place the anchor across the pipeline with an insufficient clearance caused the pipeline damage. The court's finding of causation is not clearly erroneous and is controlling.

■ Finally, Sea Level and C.S.I. argue that the court failed to address the issue whether McCormick exercised reasonable care when he gratuitously assisted in the anchor placement. This issue also becomes immaterial when viewed in the context of the court's conclusion that Turner's negligent decision caused the damage. It is irrelevant whether McCormick's gratuitous advice was rendered with reasonable care, because, even if his advice was not reasonable, it did not cause the accident.

The court, by holding Sea Level and C.S.I. solely liable, implicitly found contrary to their interests with respect to these claimed omissions of material findings. The various codefendants raised many factual issues at trial. By imposing liability on one party (Sea Level and C.S.I.) the court necessarily and by implication found that Oceanonics did not cause or contribute to the mishap.

Sea Level and C.S.I. cite *Ionmar Compania Naviera v. Olin Corp.*, 666 F.2d 897 (5th Cir.1982), in which this court remanded the case because the district court failed to make material findings. We recognized, however, that a district court sitting without a jury is not required "to state its findings of fact at great length and in detail; rather, it [is only] required ... to state them with sufficient detail to indicate the factual basis for its ultimate conclusions of law." *Id.* at 903. *See also* Fed.R. Civ.P. 52(a). The district court, as the finder of fact, cannot be expected to address in its written opinion all conceivable factual issues. Clearly no express findings are required as to issues which are necessarily disposed of by the rulings made.

## B.

■ Sea Level and C.S.I. cite language in the contract obligating Oceanonics to "perform all work requested by" TETCO. To define requested work, they refer to a provision of the contract obligating Oceanonics to furnish labor and supplies among other items "for offshore pipeline location survey services, as required for" the overall construction project on the pipeline. These services further include "the correct placement of the marker buoys and maintenance of such buoys." The contract, however, makes no mention of a duty to assist the primary contractor or subcontractors in positioning the anchors of vessels. In the absence of any express or implied undertaking, we refuse to read Oceanonics' obligations as including a duty to assist in placing the SEA LEVEL II's anchors. The court did not err in characterizing McCormick's advice as gratuitous.

Sea Level and C.S.I. nevertheless assert that, assuming the services performed by Oceanonics in connection to the anchor placement were not required by the TETCO/Oceanonics contract, Oceanonics is still contractually obligated to indemnify Sea Level and C.S.I. as subcontractors of TETCO for the pipeline damage. Sea Level and C.S.I. refer to the following contract provision:

When any part of the work is to be performed offshore or from boats or barges, Contractor [Oceanonics] agrees to protect, defend, indemnify and save Company [TETCO] and Primary Contractor and any contractor or subcontractor of either of said parties performing work in connection with the work described in this Contract, harmless from and against all claims, demands, damages, losses, expenses, costs, liabilities, injuries, and causes of action of every kind and character arising in favor of any person or persons, including without limitation employees and agents of Contractor, Company, Primary Contractor, or said contractors or subcontractors, or the families of any such employees or agents, by reason of death or personal injury to persons or damage to or *loss of property*

*occurring in connection with, arising out of, or in any wise incident or related to Contractor's performing services and operations under this Contract, regardless of whether caused by negligence of Company, and/or Primary Contractor, and/or contractors or subcontractors of either of said parties;* and Contractor shall defend any and all actions based thereon at Contractor's sole cost and expense and shall pay all costs, attorney's fees, and other expenses arising therefrom.[1]

Sea Level and C.S.I. urge that the damage to Marathon's pipeline occurred in connection with, arose out of, or was related or incident to services performed by Oceanonics under its contract with TETCO. Sea Level and C.S.I. submit that this court has interpreted similar clauses in maritime contracts to encompass a wide range of activities related to an indemnitor's contractual services. *See, e.g., Fontenot v. Mesa Petroleum Co.,* 791 F.2d 1207 (5th Cir.1986); *Hicks v. Ocean Drilling & Exploration Co.,* 512 F.2d 817 (5th Cir.1975), *cert. denied,* 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 639 (1976). They also stress that this duty to indemnify is not dependent on whether Oceanonics caused the damage.

■ The district court correctly reasoned that, since Oceanonics did not contract to place SEA LEVEL II's anchors, the above quoted indemnity provision created no obligation on Oceanonics' part to indemnify Sea Level and C.S.I. Indemnity is not owed merely because the latter were negligent subcontractors of TETCO.

Sea Level and C.S.I. urge that precedents in this Circuit support a broad construction of "occurring in connection with" language in indemnity provisions. *See, e.g., Fontenot,* 791 F.2d at 1214. They compare the facts of this case with facts of other cases which typically have obligated the indemnifying party to pay an indemnitee for its liability arising from an incident not caused by the indemnitor.[2] This view of the contract, however, would have us read the "occurring in connection with" language to cover a limitless number of unforeseeable casualties that might have occurred during the pendency of the construction work on TETCO's pipeline. The contract language in question, while broad, cannot be read in a vacuum to apply to any situation for which a colorable argument could be made that loss of property was somehow related to Oceanonics' services under the contract.

We decline to characterize the damage to Marathon's property as "occurring in connection with, arising out of, or in anywise incident or related to [Oceanonics'] performing services under" the TETCO/Oceanonics contract in the absence of any indication that TETCO sought and Oceanonics agreed to such an unusual undertaking. This court has refused to extend the reach of an indemnity provision beyond the intent of the parties to the agreement where the undertaking urged would create "an unusual and suprising obligation." *Corbitt v. Diamond M. Drilling Co.,* 654 F.2d 329, 333 (5th Cir.1981).

The language used makes it plain that TETCO intended to draft the indemnity provision to cover all conceivable situations in which it might incur liability. The limit of that potential liability, however, was accidents that might occur during Oceanonics' performance of contract services. TETCO could have no interest in requiring Oceanonics to protect other subcontractors from their own negligence when that negligence was independent of the performance of Oceanonics' contract.

This view of the TETCO/Oceanonics indemnity provision finds additional support in the record. Sea Level and C.S.I. have consistently maintained throughout this litigation that Oceanonics was at least partially responsible for the pipeline damage. Their argument before the district court that the indemnity provision applied was

---

1. Emphasis added.

2. *See, e.g., Hicks,* 512 F.2d 817; *Day v. Ocean Drilling and Exploration Co.,* 353 F.Supp. 1350 (E.D.La.1973); *Todd v. James E. Dean Marine Divers, Inc.,* 325 F.Supp. 18 (E.D.La.1971), *aff'd,* 453 F.2d 1313 (5th Cir.1972) (per curiam).

predicated on Oceanonics' alleged breach of a contractual duty or a duty to exercise reasonable care. That court found otherwise. On appeal, Sea Level and C.S.I. continue to predicate Oceanonics' duty to indemnify on Oceanonics' involvement in a joint effort to change TETCO's protective system guarding its natural gas pipeline. The district court's finding, which we affirm, that Oceanonics' involvement in such an effort—marking all pipelines—did not cause the accident and did not contribute to Turner's decision to drop the anchor across Marathon's pipeline also ends the viability of this position.

### III. Claims Against Marathon

Sea Level and C.S.I. contest the amount of damages claimed by Marathon and awarded by the district court. They assert that Marathon's decision to replace the entire 400–foot section of the pipeline was not reasonable. Sea Level and C.S.I. also argue that an award of prejudgment interest from the date of the casualty was inappropriate since the damaged pipeline was kept in full production from the date of the accident until repairs commenced.

### A.

Sea Level and C.S.I. contend that Marathon did not act reasonably in replacing the 400–foot section of the pipeline. They argue that Marathon did not mitigate its damages, expending four times the amount necessary to return the property to its pre-accident form. They further assert that Marathon conducted a "secret survey" of the damaged pipeline and denied them the opportunity to inspect the property before repairs commenced. They also claim that they were denied the opportunity to analyze the tests and surveys and to conduct further tests of their own on the damaged pipeline. Had they had such an opportunity, Sea Level and C.S.I. submit, they could have demonstrated inaccuracies and incorrect assumptions in the information relied on by Marathon in replacing the entire 400–foot section.

The burden rests with the wrongdoer to show that the victim of tortious conduct failed to mitigate damages. *Tennessee Valley Sand & Gravel Co. v. M/V DELTA*, 598 F.2d 930, 933 (5th Cir.1979). The tortfeasor must demonstrate (1) that the injured party's conduct after the accident was unreasonable and (2) that the unreasonable conduct had the consequence of aggravating the harm. *Id.* In an admiralty action, the district court's determination of damages, including its consideration of the above criteria, is a factual finding subject to the clearly erroneous standard of review. *See Gele v. Wilson*, 616 F.2d 146 (5th Cir.1980).

The district court first determined that Marathon's decision to replace the 60–foot portion of displaced pipeline was not unreasonable and did not have the consequence of aggravating the harm. It examined the basis for Marathon's decision—the diver's report based on visual inspection and the Brown and Root stress analysis recommending replacement of this portion—and concluded that Marathon's reliance on these reports was reasonable. The district court recognized two additional bases for Marathon's decision: (1) Marathon's reliance on its past experience with two pipelines which had sustained anchor damage and which eventually ruptured; and (2) Marathon could have been found strictly liable for any damages caused by oil pollution resulting from a rupture of a displaced oil pipeline pursuant to federal law.

The court further noted that any inaccuracies in the diver's report or Brown and Root's analysis would be irrelevant for purposes of determining reasonableness. The district court recognized, for example, that no "flat spots" were found on the replaced section of pipeline after it was inspected on shore. It also noted a flaw in Brown and Root's stress analysis—the assumption that a single point load deflected the pipeline 25 feet. (The evidence later showed that the anchor slid along the pipeline for a distance of approximately 175 feet before coming to rest at its eventual location.) However, the court found that neither of these inaccuracies were sufficient to render Marathon's conduct unreasonable.

The court then concluded that the decision to replace the entire 400–foot section was reasonable because the evidence showed that this alternative was more economical than replacing only 60 feet of pipe and repairing the coating damage on the remaining portion. Accordingly, Marathon was awarded the entire amount that it had expended in replacing the pipeline section.

■ We find that the district court's determination of damages had a firm basis in the evidence and is not clearly erroneous. We are not persuaded by the argument urged by Sea Level and C.S.I. that Marathon conducted a "secret survey" which prevented them from bringing alleged inaccuracies in the reports to the attention of Marathon. Sea Level and C.S.I. maintain that Marathon denied them and their underwriters the opportunity to analyze the tests and reports and to conduct tests of their own before repairs. They cite cases in this Circuit which they contend stand for the proposition that when a party conducts a survey of its own and refuses to permit a joint survey courts view the plaintiff's eventual damage claims with suspicion. *See e.g., Florida East Coast Railway Co. v. Revilo Corp.,* 637 F.2d 1060, 1067 (5th Cir.1981); *Delta Marine Drilling Co. v. M/V BAROID RANGER,* 454 F.2d 128, 130 (5th Cir.1972).

The facts in the case at bar do not support such a claim. Opposing the contention of Sea Level and C.S.I. that Marathon prevented their having input in the decisions regarding repairs is the evidence showing that neither Sea Level and C.S.I. nor its underwriters requested a joint survey or other means of examination until after all Marathon's inspections of the damaged pipeline were completed. The district court considered this conflicting evidence and concluded that Marathon's conduct was not unreasonable. This finding is supported by the record and is not clearly erroneous.

### B.

Sea Level and C.S.I. challenge the district court's award of prejudgment interest. They argue that interest should not have been awarded from the date of the mishap, since Marathon operated the damaged pipeline with no reduction in pressure for two months after the accident. The pipeline section was then replaced during a shutdown, which was scheduled by Marathon before the accident occurred.

■ The award of prejudgment interest in an admiralty action is committed to the sound discretion of the district court. *Curry v. Fluor Drilling Services, Inc.,* 715 F.2d 893, 896 (5th Cir.1983). Sea Level and C.S.I. concede that interest will usually be awarded in this Circuit from the date of the incident. *King Fisher Marine Service, Inc. v. NP SUNBONNET,* 724 F.2d 1181, 1187 (5th Cir.1984); *American Zinc Co. v. Foster,* 441 F.2d 1100 (5th Cir.1971), *cert. denied,* 404 U.S. 855, 92 S.Ct. 99, 30 L.Ed.2d 95. They nevertheless urge the rule be changed to disallow interest where the accident results in a loss that is less than total and allow interest only from the date that the injured party pays for the repairs. *See THE HYGRADE NO. 24, Inc. v. THE DYNAMIC,* 233 F.2d 444 (2d Cir. 1956).

We are bound by the law of this Circuit. Furthermore, we are not persuaded that this case is so unusual that we should recognize an exception to the rule. Sea Level and C.S.I. suggest that prejudgment interest from the date of the casualty will somehow put Marathon in a better position than it would have been in had the accident not occurred, because it did not incur any expense until two months afterwards. This is simply not the case. Marathon incurred a variety of post-accident/pre-repair expenses related to the investigation of the damage. In addition, had Marathon been forced to defer production from the date of the mishap until repairs were feasible, it could have sued the defendants for additional damages due to deferred production losses. By waiting until the scheduled shutdown to commence repairs, Marathon may have minimized the amount of damages. The award of prejudgment interest in this case was well within the discretion of the district court.

### IV. Summary

The damage to Marathon's pipeline was caused by Captain Turner's negligent decision to position the anchor across the pipeline. It was not related to Oceanonics' services under its contract with TETCO. Oceanonics was not obligated to indemnify Sea Level and C.S.I. for their own independent negligence. The district court properly interpreted the TETCO/Oceanonics contract as not requiring Oceanonics to assist in positioning the SEA LEVEL II's anchors and the court thus did not err in characterizing McCormick's advice with respect to the anchor placement as gratuitous. The district court did not err in failing to make findings as to Oceanonics' alleged breach of its warranty of workmanlike performance, its contractual duty to maintain the marker buoys, or McCormick's duty to exercise reasonable care when acting gratuitously. Finally, the court's determination of damages is not clearly erroneous and its award of prejudgment interest was not an abuse of discretion.

AFFIRMED.