**REVISED July 11, 2017**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fif h Circuit

**FILED**

June 21, 2017

Lyle W. Cayce
Clerk

No. 16-30456

INTERNATIONAL MARINE, L.L.C.; INTERNATIONAL OFFSHORE
SERVICES, L.L.C.,

> Plaintiffs - Appellants

TESLA OFFSHORE, L.L.C.,

> Intervenor Plaintiff - Third Party Plaintiff - Appellant

v.

INTEGRITY FISHERIES, INCORPORATED; SEA EAGLE FISHERIES,
INCORPORATED,

> Defendants – Appellees

NATIONAL SECURITY FIRE AND CASUALTY COMPANY; ATLANTIC
SPECIALTY INSURANCE COMPANY; ONE BEACON INSURANCE
COMPANY; NEW YORK MARINE AND GENERAL INSURANCE
COMPANY,

> Third Party Defendants - Appellees

Appeals from the United States District Court
for the Eastern District of Louisiana

Before SMITH, ELROD, and HAYNES, Circuit Judges.

HAYNES, Circuit Judge:

No. 16-30456

International Marine, L.L.C., International Offshore Services, L.L.C. (collectively "International"), and Tesla Offshore, L.L.C. ("Tesla"), appeal the district court's grant of summary judgment dismissing their indemnity and insurance claims.[1]  For the reasons explained below, we AFFIRM in part and VACATE and REMAND in part.

## I.  Background

This case involves an allision in the Gulf of Mexico causing significant damage to a submerged mooring line for the M/V NAUTILUS (the "NAUTILUS"), a mobile offshore drilling unit used by Shell Offshore, Inc. ("Shell"), to conduct drilling operations.  The principal dispute before this court concerns whether third parties are contractually obligated to pay for that damage.

Tesla, an offshore survey company, was tasked with performing an archaeological sonar survey in the Gulf of Mexico.  To perform this survey, Tesla required two vessels: a larger vessel, called the "tow vessel," and a smaller vessel, called the "chase vessel."  Tesla contracted with International to provide and operate the tow vessel, called the M/V INTERNATIONAL THUNDER (the "THUNDER").  As to the chase vessel, Tesla initially contracted with Integrity Fishers, Inc. ("Integrity"), but after Integrity's vessel developed mechanical issues, Integrity substituted a different chase vessel owned and operated by Sea Eagle Fisheries, Inc. ("Sea Eagle"), called the F/V LADY JOANNA (the "JOANNA").[2]

---

[1] International attempted to amend its complaint to include claims against the insurers, but the district court denied this amendment as "futile" in its summary judgment decision.  This opinion refers to the claims described in International's proposed amended complaint and Tesla's claims against the insurers collectively as the "insurance claims."  On remand, the district court should reconsider the motion to amend.

[2] The parties dispute whether Integrity was also an owner of the JOANNA.  Integrity admitted that Charles V. Rodriguez, Sr., is president of both Integrity and Sea Eagle, and

The THUNDER traveled along a survey grid while towing a "towfish," owned by Tesla. The towfish was attached to a cable, nearly two miles long, and was towed close to the bottom of the ocean, where it emitted sonar signals and transmitted the echo of those signals to Tesla equipment on the chase vessel. Tesla personnel, rather than the crew of the chase vessel, operated the Tesla equipment. At the time of the allision, the chase vessel was the JOANNA. According to Tesla's party chief aboard the JOANNA, the Tesla tracking equipment was "our responsibility," whereas the crew of the JOANNA was responsible for "driving the vessel and staying within . . . a radius of a tow fish." The Tesla equipment automatically relayed the sonar signals to the THUNDER, which allowed the Tesla survey team to monitor the towfish and maintain the proper towfish position above the ocean bottom and in relation to the survey grid.

The precipitating incident for this litigation was an allision between the towfish cable and a submerged mooring line for the NAUTILUS. Prior to the allision, the towfish had experienced technical problems, forcing Tesla to reel it onto the THUNDER for repairs. The THUNDER and the JOANNA temporarily went off the grid toward the south until the towfish was repaired and redeployed, at which point the THUNDER turned north, back toward the grid, followed by the JOANNA. According to International, this turn toward the north put both vessels on a course that brought them closer to the NAUTILUS. The JOANNA's captain informed Tesla's party chief, who was occupied with the Tesla equipment, that the THUNDER was getting too close to the NAUTILUS. The party chief then radioed the THUNDER to warn of the danger, but his warning was met with assurances that everything was okay. The party chief testified that about thirty to forty-five minutes later the towfish

evidence suggests that Integrity has an insurable interest in the JOANNA. Nevertheless, because we affirm the dismissal of the indemnity claim, we need not resolve this dispute.

cable allided with the mooring line of the NAUTILUS. The JOANNA was over the towfish and the Tesla equipment was sending sonar signals to the THUNDER immediately prior to the allision.

Shell, which was using the NAUTILUS for drilling operations when the allision occurred, sued Tesla and International for negligence.[3] In the *Shell v. Tesla* negligence litigation, a jury awarded damages to Shell and determined that Tesla was 75% at fault and International was 25% at fault. In the present action before this court, Tesla and International claim they are entitled to indemnity from Integrity and Sea Eagle because the allision related to the operation of the JOANNA. Tesla and International additionally claim that they are entitled to insurance coverage because they were added as additional insureds on Integrity's and Sea Eagle's insurance policies with Atlantic Specialty Insurance Company/One Beacon Insurance Company ("One Beacon") and New York Marine & General Insurance Company ("NY MAGIC").[4]

The contractual relationships between Tesla, Integrity, and Sea Eagle were set out in two master service agreements ("MSAs"). The parties agree that the MSAs were identical in all relevant respects, and this litigation focuses on two articles, Article 9 and Article 11. Article 9 provides, in relevant part, that the indemnitors (here, Integrity or Sea Eagle) are liable to Tesla and

---

[3] This litigation is referred to as *Shell v. Tesla*.

[4] This indemnity and insurance lawsuit took a circuitous route before reaching its present iteration. In response to Shell's lawsuit, Tesla and International impleaded Sea Eagle for indemnity. Upon discovering that Integrity may have had an ownership interest in the JOANNA, International subsequently filed a separate indemnity lawsuit against Integrity—which was the initiating suit for the present action before this court. The district court concluded that the Sea Eagle indemnity claim in *Shell v. Tesla* was related to the International lawsuit, and thus decided to consolidate the Sea Eagle indemnity claim with the International lawsuit. *Shell v. Tesla* continued as a trial on International and Tesla's fault for the allision with the NAUTILUS, while the International lawsuit was used to settle any indemnity and insurance claims. Thus, the district court dismissed the claims against Sea Eagle from *Shell v. Tesla* and permitted them to be reasserted here, which International did via a second amended complaint and Tesla did via a third-party demand. Tesla then impleaded Sea Eagle's and Integrity's insurers, One Beacon and NY MAGIC.

its contractors for damage to third party property "arising out of or related in any way to the operation of any vessel owned . . . by [Integrity or Sea Eagle] . . . to perform work under this agreement except to the extent such loss, harm, infringement, destruction, or damages is caused by [Tesla's or its contractor's] gross negligence or willful misconduct." This obligation is owed "regardless of cause including who may be at fault or otherwise responsible under any contract, statute, rule or theory of law." Article 11 requires, in relevant part, that Sea Eagle and Integrity provide insurance coverage for "third party claims arising out of or connected with the performance of Service hereunder," and name Tesla and its contractors as additional insureds. The insurance obligations purchased under the MSAs were required to be "independent of the indemnity obligations contained in the contract/agreement and [to] apply regardless of whether the indemnity provisions contained in the contract/agreement are enforceable."

The insurers filed three motions to dismiss. The district court, however, never explicitly decided these motions. While they were still pending, Integrity and Sea Eagle filed motions for summary judgment. Tesla and International responded with their own cross-motions for summary judgment. The district court granted Integrity's and Sea Eagle's motions and denied Tesla's and International's motions, concluding that "Shell's claims for damages based on the M/V NAUTILUS incident did not arise out of, and are not related to, the operation of the F/V LADY JOANNA." Furthermore, because it found that there was no indemnity obligation, the district court also concluded that the insurers did not have any obligations to Tesla or International, and it dismissed all claims against the insurers. Tesla and International timely appealed.[5]

---

[5] In February 2016, prior to the district court's summary judgment order, Tesla, International, Integrity, and Sea Eagle reached a partial settlement, but expressly reserved

No. 16-30456

## II.  Standard of Review

We review a grant of summary judgment de novo.  *Int'l Marine, L.L.C. v. Delta Towing, L.L.C.*, 704 F.3d 350, 354 (5th Cir. 2013).  "Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Id.* (quoting FED. R. CIV. P. 56(a)).  The interpretation of a maritime contract is a question of law.  *Id.*

## III.  Discussion

### A. Indemnity Claims

Tesla and International make two principal arguments: the JOANNA's operation was "related to" the damages sustained by the NAUTILUS because (1) the JOANNA's job was to position itself above the towfish, thereby enabling the onboard Tesla equipment to relay a sonar signal to the THUNDER for proper navigation; and (2) the JOANNA and the THUNDER were involved in a joint sonar survey operation in which the JOANNA played an essential role. We conclude that the summary judgment evidence supports only one finding: the operation of the JOANNA was independent of the negligent conduct found to have caused damage to the NAUTILUS.  Accordingly, we affirm the district court's judgment and hold that neither Sea Eagle nor Integrity owe indemnity under the MSAs.

Under federal maritime law, an indemnity contract covers losses within the contemplation of the parties but not those which are "neither expressly within its terms nor of such a character that it can be reasonably inferred that

---

the indemnity and the insurance claims.  As part of that agreement, Integrity and Sea Eagle were given a guarantee that no uninsured judgment would be collected against them.  In Tesla's impleader and third-party complaint, it alleged that NY MAGIC issued a "Bumbershoot Policy" adding the JOANNA and providing coverage for contractual liability. Because of this agreement, although Integrity and Sea Eagle remain parties to this lawsuit, the only parties making an active defense of the district court's order are One Beacon and NY MAGIC.

the parties intended to include them within the indemnity coverage." *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 333 (5th Cir. 1981). We look to the contract as a whole and can only look beyond the contract if there is an ambiguity. *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1214 (5th Cir. 1986). "[W]e have broadly construed language identical or similar to the 'arising in connection herewith' language in [the agreement at issue] to unambiguously encompass all activities reasonably incident or anticipated by the principal activity of the contract." *Id.* Though broad, however, such an undertaking is not limitless. *Marathon Pipe Line Co. v. M/V Sea Level II*, 806 F.2d 585, 591 (5th Cir. 1986) (rejecting a construction that would "read the 'occurring in connection with' language to cover a limitless number of unforeseeable casualties that might have occurred during the pendency of the construction work on [the company's] pipeline"). When one party's negligent contractual performance causes third party property damage independent of the alleged indemnitor's contractual performance, indemnity is usually not required absent a clear indication that the parties agreed to such an unusual undertaking. *See id.*

In *Marathon*, we examined whether the damage in question was related to the services performed by the alleged indemnitor, Oceanonics, under its contract. *Id.* at 590–91. We explained that the contract could not "be read in a vacuum to apply to any situation for which a colorable argument could be made that loss of property was somehow related to Oceanonics' services under the contract." *Id.* at 591. Instead, we held that "since Oceanonics did not contract to place [the vessel in question's] anchors, the . . . indemnity provision created no obligation on Oceanonics' part to indemnify [the plaintiff]." *Id.*

Here, as in *Marathon*, Tesla and International's negligence, as well as the resulting damage to the NAUTILUS, was independent of the operation of the JOANNA. The principal activity of the contract between Tesla and

7

Integrity/Sea Eagle was for Integrity/Sea Eagle to operate the JOANNA as a chase vessel—i.e., to navigate the JOANNA so that it remained above the towfish.  The MSAs are clear that the NAUTILUS's damage must relate to or arise out of the operation of the JOANNA before an indemnity obligation arises.  Nothing about the JOANNA's successful operation as a chase vessel, however, related to Tesla's decisions to redeploy the towfish near the NAUTILUS and take the route back toward the grid that caused an allision with a submerged mooring line.  The undisputed evidence shows that Tesla and International were solely responsible for deploying the towfish, positioning the towfish, releasing the appropriate amount of towline dragging the towfish, and choosing the direction in which the towfish would travel.  The JOANNA's job was simply to follow the THUNDER and stay above the towfish, wherever it may go, which it performed successfully.  Tesla's equipment would then relay the position of the towfish.  The JOANNA's "involvement in such an effort— [the sonar survey]—did not cause the accident and did not contribute to [Tesla's and International's] decision to dr[ive] the [towfish] across [the NAUTILUS's mooring line]." *Id.* at 592.

Indemnity is not owed merely because Tesla and International were negligent during the survey, in the absence of the requisite connection to the JOANNA's operation.  *See id.* at 591.  Although the JOANNA was still in operation carrying out the joint sonar survey and in position over the towfish at the time of the allision, its indisputably successful operation had no bearing on the decision to redeploy the towfish near the NAUTILUS and cross the NAUTILUS's mooring line.[6]  Because the summary judgment evidence

---

[6] In *Marathon*, we observed that "potential liability" under the indemnity provision was limited to "accidents that might occur during [the contractor's] performance of contract services." *Marathon*, 806 F.2d at 591.  This statement did not mean that every accident occurring during the contractor's performance of contract services would trigger the indemnity provision.  It merely meant that the potential for liability was possible only during

supports only the conclusion that the JOANNA's operation made no contribution to the negligent act causing the NAUTILUS's damages, indemnity is not owed under the MSAs. *See id.* at 592; *cf. Fontenot*, 791 F.2d at 1216 ("[T]he Mesa-Rowandrill contract contemplated the operation of a heliport aboard the [drilling rig] and . . . Fontenot's injuries occurred 'in connection []with' the operation of that heliport." (third alteration in original)).

To be clear, we continue to subscribe to the general rule articulated in *Fontenot* that indemnity agreements containing language such as "arising out of" should be read broadly. *See Fontenot*, 791 F.2d at 1214. It is only when the alleged indemnitor's contractual performance is *completely independent* of another party's negligent act that caused damage that we apply a limitation to this general rule. *See Marathon*, 806 F.2d at 591.

In *Marathon*, we also concluded that a gratuitous warning by the alleged indemnitor to the plaintiff of potential danger did not give rise to indemnity liability that would not otherwise exist. *Id.* at 590. Similarly here, the warning

---

the contractor's performance of services under the contract. There are instances in which accidents occurring during a contractor's performance are nevertheless independent of that performance. This case is one example: a joint sonar survey was underway and Integrity/Sea Eagle successfully performed its obligations under the contract by positioning the JOANNA above the towfish while another contractor negligently performed its own obligations by running the towfish into a submerged mooring line, and the JOANNA had no additional relationship to the resulting damages. Under such circumstances, no indemnity is owed unless the contract indicates that Integrity/Sea Eagle "agreed to such an unusual undertaking." *Id.* In another example, if the THUNDER itself had negligently allided with the NAUTILUS while the joint sonar survey was still underway and the JOANNA was still in operation positioned above the towfish, this negligent act would be independent of the JOANNA's operation. Imposing an indemnity obligation merely because of the JOANNA's involvement in the ongoing joint sonar survey would create "an unusual and surprising obligation." *See id.* (quoting *Corbitt*, 654 F.2d at 333).

By contrast, if the JOANNA developed a technical issue impairing its performance—even if caused by the installation of Tesla's equipment or the conduct of Tesla's onboard crew—and third party damages arose from that technical failure, then those damages might arise out of or relate to the JOANNA's operation. Similarly, if, during the sonar survey, a third party boarded the JOANNA to refuel it or to repair Tesla equipment, and either the third party's equipment were damaged or personnel were injured, then those damages might arise out of or relate to the JOANNA's operation. *See Fontenot*, 791 F.2d at 1214.

from the JOANNA's captain to Tesla's party chief that the THUNDER was moving too close to the NAUTILUS was, as the district court correctly concluded, a gratuitous act that has no effect on the outcome of this litigation. *See id.*

## B. Insurance Claims

The district court concluded that because the indemnity claims failed, the insurance claims also failed. Although similarities in the contractual obligations for indemnity and insurance under the MSAs may suggest that indemnity and insurance claims rise and fall together in this litigation, such a parallel is not always the case. The scope of insurance coverage is determined by the language of the insurance policy obtained,[7] which may yield a different result than the indemnity provision in the original contract. *See Six Flags, Inc. v. Westchester Surplus Lines Ins. Co.*, 565 F.3d 948, 954 (5th Cir. 2009) ("The language of the policy is the starting point for determining [the parties'] intent."); *Elliott v. Cont'l Cas. Co.,* 949 So.2d 1247, 1254 (La. 2007) ("The parties' intent, as reflected by the words of the policy, determine the extent of coverage."); s*ee also Int'l Offshore Servs., L.L.C. v. Linear Controls Operating, Inc.*, 647 F. App'x 327, 329 (5th Cir. 2016) ("Even assuming *arguendo* that the MSC required Linear to secure [insurance] coverage, that would not determine whether Linear actually secured the coverage in this Policy. We must look to

---

[7] Following the Supreme Court's decision in *Wilburn Boat Co. v. Fireman's Fund Insurance Co.*, 348 U.S. 310 (1955), we have held that "the interpretation of a contract of marine insurance is—in the absence of a specific and controlling federal rule—to be determined by reference to appropriate state law." *Ingersoll-Rand Fin. Corp. v. Emp'rs Ins. of Wasau*, 771 F.2d 910, 912 (5th Cir. 1985); *see also Wilburn*, 348 U.S. at 313 ("In the field of maritime contracts as in that of maritime torts, the National Government has left much regulatory power in the States."); *Albany Ins. Co. v. Kieu*, 927 F.2d 882, 886 (5th Cir. 1991) ("State law, therefore, governs the interpretation of marine insurance policies unless an available federal maritime rule controls the disputed issue."). Under Louisiana law, insurance contracts are subject to general rules of contract interpretation under the civil code. *Bernard v. Ellis*, 111 So. 3d 995, 1002 (La. 2007).

the Policy's language . . . ."); *Holden v. U.S. United Ocean Servs., L.L.C.*, 582 F. App'x 271, 273 (5th Cir. 2014) (in a case involving both an indemnity obligation and an obligation to add a party as a named insured, court analyzed each possible ground for liability separately: "We discern two possible ways in which there could be coverage . . . (1) if [the indemnitor] were liable via its indemnity, . . . or (2) if the [] claims against the indemnitee were covered by the policy pursuant to [its] status as an additional insured under the policy.").[8]

Here, none of the insurance policies are in the record nor is there any other evidence from which the policy language can be definitively discerned. Summary judgment cannot be granted on the insurance claims without first reviewing the insurance policies and determining their scope. It is possible that Tesla and International were added as additional insureds on a policy that provides more coverage than that set forth in the MSAs. On this record, however, we cannot make that determination. Accordingly, we vacate the district court's judgment as to Tesla's and International's insurance claims and remand those claims for appropriate disposition.

For the foregoing reasons, we AFFIRM the summary judgment dismissing the indemnity claims, VACATE the dismissal of the insurance claims, and REMAND the case to the district court for further proceedings consistent with this opinion.

---

[8] Although *International Offshore Services* and *Holden* are not "controlling precedent," they "may be [cited as] persuasive authority." *Ballard v. Burton*, 444 F.3d 391, 401 n.7 (5th Cir. 2006) (citing 5TH CIR. R. 47.5.4).