# United States Court of Appeals
# for the Fifth Circuit

———————————

No. 23-30672

———————————

United States Court of Appeals
Fifth Circuit

**FILED**
June 25, 2024

Lyle W. Cayce
Clerk

Darryl Cole,

*Plaintiff*,

*versus*

Huisman North America Services, L.L.C.,

*Defendant/Third Party Plaintiff—Appellee*,

*versus*

Pharma-Safe Industrial Services, Incorporated,

*Third Party Defendant—Appellant*.

———————————————————————

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:21-CV-1348

———————————————————————

Before Dennis, Southwick, and Ho, *Circuit Judges*.

Per Curiam:[*]

———————————————

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 23-30672

Darryl Cole suffered a stroke while employed as a crane operator onboard the DSV OCEAN PATRIOT, an offshore vessel in the Gulf of Mexico. Cole sued Oceaneering International, Inc., the owner of the OCEAN PATRIOT, asserting that the onboard medic negligently misdiagnosed his symptoms, delaying him from receiving proper treatment on shore. This appeal concerns whether Huisman North America Services, L.L.C.—Cole's direct employer and one of Oceaneering's contractors—must indemnify Oceaneering's medical services contractor, Pharma-Safe Industrial Services, Inc., for its settlement with Cole.

We hold that the text of Huisman's indemnity agreement with Oceaneering covers Pharma-Safe's claim for indemnity from Huisman. An offshore worker's claim arises out of or is incident to his services if it involves the quality of emergency medical care received while living onboard an offshore vessel. We accordingly reverse, render summary judgment for Pharma-Safe, and remand for further proceedings.

**I.**

In February 2021, Oceaneering contracted with Huisman to provide a crane operator for the OCEAN PATRIOT, a diving and support vessel operating off Louisiana. In accordance with that agreement, Huisman supplied Oceaneering with Cole's services for a period quoted at 28 days.

Several years before Oceaneering acquired Cole's services, Oceaneering and Huisman had executed a "Mutual Indemnity and Waiver Agreement" in which each company agreed to indemnify the other for claims brought by their own employees or contractors. Specifically, this agreement stated:

> [Huisman] shall be liable and shall release, indemnify and hold harmless and waive all rights of recourse against the [Oceaneering] Group, from and against any and all claims,

2

No. 23-30672

> demands or causes of action of every kind and character, brought by any person or party, for injury to, illness or death of any member of the [Huisman] Group . . . which injury, illness, death, damage or loss *arises out of or is incident to the Services*.

(Emphasis added; capitalization omitted.)   Each company's "Group" included its contractors and subcontractors.

The agreement further stated that it was executed to "avoid entirely disputes as to [Huisman and Oceaneering's] liabilities for damage or injuries to their respective property or people by providing for a system of mutual indemnity between the parties with respect to their respective people and property during times when [Huisman] requires access to [Oceaneering's] Facilities during the performance of the Services."   And, in bold and capitalized print, the agreement made clear that it was "without limit and without regard to the cause(s) thereof, including without limitation the negligence or fault of any party or third party."

Oceaneering had also previously contracted with Pharma-Safe to provide medical management services for Oceaneering.   Pursuant to that agreement, Pharma-Safe supplied Oceaneering with both an onboard medic and an on-call shoreside physician for the OCEAN PATRIOT.[1]

Cole boarded the OCEAN PATRIOT on February 10, 2021.   Cole alleged that he started to feel sick during the night on or about February 17, with symptoms including vomiting, dizziness, and pain and numbness in his head, eyes, and neck.   Cole reported his symptoms to the captain early the next morning and asked to see the onboard medic.   According to Cole's

---

[1] Pharma-Safe's contract with Oceaneering also included an indemnity agreement requiring Pharma-Safe to indemnify Oceaneering for any "negligent or intentional acts or omissions by Pharma-Safe, [and] its employees or agents, arising out of its duties" under the contract.

3

complaint, the medic examined Cole and noted symptoms including an oxygen saturation level of 76% and a heart rate of 39, but concluded that Cole was seasick and had a mouth abscess. Cole further noted that he explained to the medic and captain that he is a career mariner who does not experience seasickness, and told the medic why he did not think a mouth abscess was causing his symptoms. However, Cole alleged that, after consulting with the shoreside physician, the medic provided Cole with medicine for seasickness and recommended that Cole rest.

Over the next day, Cole rested in bed while the vessel was down due to bad weather, but his symptoms worsened. Cole alleged that the onboard medic continued to believe Cole was merely seasick and provided him with crackers, antibiotics, and seasickness medicine.

On February 20, Cole felt well enough to relieve another crane operator for approximately half an hour. The next morning, Cole attempted to work his shift but again experienced the same symptoms, along with delusions and falling in and out of consciousness. Cole alleged that during this time, the medic suspected Cole may have contracted COVID-19 and that, despite his symptoms, the decision to evacuate him was not made until 1:05 p.m. Around midafternoon Cole was flown to shore and taken to the emergency room, where he was diagnosed as having experienced a stroke.

Cole sued Oceaneering, alleging that Oceaneering negligently failed to ensure that he received proper treatment despite showing clear stroke symptoms. Oceaneering in turn filed a third-party complaint seeking defense and indemnity from Huisman. Cole then amended his complaint to add a claim for maintenance and cure against Huisman.

Huisman later filed a third-party complaint against Pharma-Safe and the shoreside physician, asserting that Pharma-Safe and the physician were liable to Huisman for contribution and indemnity. Huisman also tendered

Pharma-Safe and the shoreside physician as defendants to Cole's claims and Pharma-Safe as a defendant to Oceaneering's defense and indemnity claim under Federal Rule of Civil Procedure 14(c).

In response, Oceaneering moved to strike Huisman's Rule 14(c) tenders, and Pharma-Safe cross-claimed against Huisman for indemnity and defense. Pharma-Safe and Huisman then filed competing motions for summary judgment on Pharma-Safe's indemnity cross-claim.

The district court subsequently issued several orders, most notably granting Huisman's motion for summary judgment on Oceaneering's defense and indemnity claim.[2] The district court also granted Oceaneering's motion to strike Huisman's Rule 14(c) tenders. Shortly afterwards, the parties informed the district court that Oceaneering and Pharma-Safe had reached a settlement with Cole. At that point, the only remaining dispute relevant to this appeal was whether Huisman is obligated to indemnify Pharma-Safe.

The district court granted summary judgment for Huisman and denied Pharma-Safe's motion for summary judgment, concluding that Huisman is not required to indemnify Pharma-Safe for its settlement with Cole. The district court concluded that Cole's alleged injury did not arise out of the services Huisman provided Oceaneering. According to the district court, such a connection did not exist because Cole's stroke was not caused by his crane operator duties.

Pharma-Safe appealed under 28 U.S.C. § 1292(a)(3), which provides courts of appeals with jurisdiction over appeals of "[i]nterlocutory decrees of such district courts or the judges thereof determining the rights and liabilities

---

[2] The parties have not appealed that decision. We therefore address only Huisman's indemnity obligations to Pharma-Safe.

of the parties to admiralty cases in which appeals from final decrees are allowed."

We review grants of summary judgment de novo. *Int'l Marine, L.L.C. v. Delta Towing, L.L.C.*, 704 F.3d 350, 354 (5th Cir. 2013). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

## II.

Federal maritime law governs this case. *See Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 332 (5th Cir. 1981). Maritime indemnity contracts cover harms that are either "expressly within [the agreement's] terms" or that are "of such a character that it can be reasonably inferred that the parties intended to include them within the indemnity coverage." *Int'l Marine, L.L.C. v. Integrity Fisheries, Inc.*, 860 F.3d 754, 759 (5th Cir. 2017) (internal quotation omitted).

We have repeatedly noted that maritime indemnity agreements that "contain[] language such as 'arising out of' should be read broadly." *Id.* at 761. *See also Fontenot v. Mesa Petrol. Co.*, 791 F.2d 1207, 1217 (5th Cir. 1986) ("[A]bsent more precise evidence of intent, phrases such as 'arising out of the performance of' are to be construed broadly to include all activities attributable to or reasonably anticipated by the principal contractual activity.").

Such indemnification provisions are not limited to incidents involving the active performance of job duties. Instead, in the maritime context, a worker's presence at the scene—if "attributable to or . . . reasonably . . . anticipated by his employment responsibilities"—is enough to trigger an indemnification clause. *Id.* at 1215. "Any other result would deny the realities of maritime life," in which "[n]umerous contractors, subcontractors

and sub-subcontractors must work together in close quarters, all working toward a common goal but performing diverse tasks." *Id.* at 1215 n.8.

In this case, Cole asserts that his stroke was either caused or exacerbated by the onboard medic's allegedly negligent failure to promptly evacuate him to shore once he displayed obvious stroke symptoms. We agree with Pharma-Safe that such a claim "arises out of or is incident to [Huisman's] Services."

Huisman and Oceaneering contracted for Cole to work onboard the OCEAN PATRIOT for 28 days. Given the nature of the offshore industry and the length of Cole's assignment, Huisman undoubtedly understood that Cole was to live onboard the vessel while completing his work. Cole ate and slept onboard the vessel, and, as one of Huisman's employees testified, once Cole was onboard, he was "to meld in and function as part of the crew."

Common sense dictates that, once on the vessel, Cole's options for immediate medical assistance were limited. Huisman's brief argues that evacuation to shore is "the routine practice for serious and prolonged medical episodes for offshore workers." But Cole's claim is that Pharma-Safe negligently failed to do just that.[3] His claim is therefore "attributable to or reasonably anticipated by" his employment responsibilities, *Fontenot*, 791 F.2d at 1217, and falls within the scope of the indemnification agreement.[4]

---

[3] The district court "reject[ed] as completely baseless Pharma-Safe's contention that Cole's stroke arose out of his crane operating services merely because he was on the M/V OCEAN PATRIOT at the time it occurred." But Cole's allegation is not simply that his illness occurred on the vessel. As noted above, his claim is that the onboard medic's allegedly negligent misdiagnosis and delay in evacuating him caused or worsened his condition.

[4] The fact that Cole sought medical assistance onboard the vessel is particularly unsurprising considering the district court's determinations—which have not been appealed—that Cole qualifies as a Jones Act seaman and that Oceaneering was Cole's Jones

No. 23-30672

Huisman argues that it could not reasonably anticipate that Cole would seek assistance from an onboard medical services contractor. But the text of the indemnity agreement clearly contemplates that Huisman may be required to indemnify Oceaneering's contractors, not just Oceaneering itself. Our case law has long indicated that maritime indemnity agreements like the one in this case cover harm caused by activities onboard the vessel that are otherwise unrelated to the injured employee's job duties. *See id.* at 1215 n.8 ("Off-duty or otherwise uninvolved employees are placed at risk by the myriad goings-on no less than the employees who actually perform the drilling, welding, cooking, and so on."). And the indemnity agreement confirms that indemnity is keyed to Cole's presence onboard the vessel, not just his operation of the crane during his shifts. As noted above, the agreement states that it was executed to "provid[e] for a system of mutual indemnity between the parties with respect to their respective people and property *during times when [Huisman] requires access to [Oceaneering's] Facilities* during the performance of the Services." (Emphasis added.)

Huisman further contends that it is not obligated to indemnify Pharma-Safe because of an exception to the general rule that "arising out of" language in maritime indemnity agreements should be read broadly. In cases involving harm to unrelated third parties, we have held that "indemnity is usually not required absent a clear indication that the parties agreed to such an unusual undertaking." *Int'l Marine*, 860 F.3d at 759. Huisman points to two cases in which we have recognized this exception: *International Marine,*

---

Act employer. Under the Jones Act, shipowners are legally required to ensure that crewmembers receive "prompt and adequate" medical care, which includes ensuring that crewmen "get . . . to a doctor when it is reasonably necessary, and the ship is reasonably able to do so." *Randle v. Crosby Tugs, L.L.C.*, 911 F.3d 280, 283 (5th Cir. 2018) (internal quotation omitted).

*L.L.C. v. Integrity Fisheries, Inc.*, 860 F.3d 754 (5th Cir. 2017), and *Marathon Pipe Line Co. v. M/V Sea Level II*, 806 F.2d 585 (5th Cir. 1986).

In *International Marine*, Tesla Offshore, L.L.C., an offshore survey company, contracted to obtain both a tow vessel and a chase vessel so it could perform an archaeological sonar survey in the Gulf of Mexico. *See* 860 F.3d at 757. In conducting the survey, the tow vessel pulled a "towfish" connected to the tow vessel by a nearly two-mile cable. *Id.* Tesla and the tow vessel contractor were "solely responsible for deploying the towfish, positioning the towfish, releasing the appropriate amount of towline dragging the towfish, and choosing the direction in which the towfish would travel." *Id.* at 760. In contrast, the chase vessel's responsibility was to position itself above the towfish to receive the towfish's sonar signals. *Id.* at 757, 760.

Another company sued Tesla and the tow vessel contractor after the towfish cable struck that company's submerged mooring line. *Id.* at 756–58. Tesla and the tow vessel contractor sought indemnity from the chase vessel contractors. *Id.* However, we held that the chase vessel's operation was "independent of the negligent conduct found to have caused [the] damage." *Id.* at 759. The chase vessel contractors were therefore not obligated to indemnify Tesla and the tow vessel contractor. *Id.*

In *Marathon*, Sea-Con Services, Inc., contracted to perform construction work on a natural gas pipeline in the Gulf of Mexico owned by Texas Eastern Transmission Corporation. 806 F.2d at 587. Sea-Con in turn contracted with two other companies to supply a workboat. *Id.* In addition, TETCO contracted with Oceanonics, Inc., which it tasked with identifying and marking all submerged pipelines in the area. *Id.* Oceanonics marked the pipelines, and the workboat set anchor without any problems. *Id.* Later, however, the workboat was repositioned. *Id.* Oceanonics cautioned against dropping the anchor in the new location, but the workboat's captain did so

anyway, resulting in damage to a third-party company's pipeline. *Id.* at 587–88.  The workboat contractors were found liable for the third-party company's damage, but they asserted that Oceanonics was obligated to indemnify them pursuant to indemnity language in the contract between TETCO and Oceanonics. *Id.* at 587–89.  We disagreed, holding that the applicable contract language "cannot be read in a vacuum to apply to any situation for which a colorable argument could be made that loss of property was somehow related to Oceanonics' services under the contract." *Id.* at 591.

Huisman argues that *International Marine* and *Marathon* control this case.  But both *International Marine* and *Marathon* concerned harm to unrelated third parties, not an employee of one of the contracting parties to a reciprocal indemnity agreement.  In that respect, this case better resembles *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207 (5th Cir. 1986), in which an employee of one of Mesa Petroleum Company's contractors slipped and fell on a drilling rig owned by a different Mesa contractor while traveling to his work assignment. *Id.* at 1210.  In *Fontenot*, we held that Mesa was obligated to indemnify the contractor that owned the drilling rig because the employee's presence on the rig was attributable to his employment responsibilities with Mesa. *Id.* at 1215–16.

The same principles apply here.  As we explained in *Fontenot*, contracts such as the one in this case "divide the responsibility for personal injury/death among the many employers and contractors according to the identity of the injured employee rather than according to which party's fault or negligence caused the injury." *Id.* at 1216.[5]

---

[5] Huisman argues that Pharma-Safe forfeited its argument based on the type of contract at issue by failing to make it to the district court.  But Pharma-Safe has consistently argued that *Fontenot*, not *International Marine* or *Marathon*, controls this case.  And, in response to Huisman's invocation of *International Marine* and *Marathon*, Pharma-Safe's

No. 23-30672

Parties are, of course, free to "contract for a more precise definition of their indemnity obligations," such as "by defining indemnity obligations according to which party's negligence caused the injury (to the extent permitted by law)" or "limiting indemnity obligations to injuries incurred during working hours or during particularized operations." *Id.* at 1215 n.8. But, as a default, an injury to a party's employee living on an offshore vessel "arises out of or is incident to" his services if the injury results from the negligent provision of necessities for life onboard an offshore vessel, such as care for urgent medical needs.

Huisman additionally argues that three other cases require us to affirm the district court. *See Smith v. Tenneco Oil Co.*, 803 F.2d 1386 (5th Cir. 1986); *Hobbs v. Teledyne Movible Offshore, Inc.*, 632 F.2d 1238 (5th Cir. 1980); *Lanasse v. Travelers Ins. Co.*, 450 F.2d 580 (5th Cir. 1971). In *Smith*, we held that the owner of an offshore vessel was not obligated to indemnify operations that took place on a drilling platform when a worker was injured while being transferred from the platform to the vessel. 803 F.2d at 1387–89. The indemnity agreement in *Smith* covered injuries that "ar[o]se[] out of or [were] incident to performance" under the contract. *Id.* at 1388. However, we noted that the vessel's "performance of the charter agreement was still incipient" at the time of the accident and that, "[w]hen Smith was injured, the [vessel] was nothing more than a bystander waiting for the opportunity to perform its task." *Id.* at 1389. In contrast, in this case, Cole was well into his 28-day service period on the OCEAN PATRIOT at the time of Pharma-Safe's alleged negligence. *Smith* therefore does not apply here.

––––––––––––––––––––––––––

reply in support of its motion for summary judgment pointed out the difference between the unrelated third-party damage in those two cases and the injury to a contracting party's employee in this case.

No. 23-30672

*Hobbs* and *Lanasse* are similarly inapposite. Like *Smith*, both cases concerned the indemnity obligations of vessels for accidents caused by the negligence of crane operators on drilling platforms. *Hobbs*, 632 F.2d at 1239; *Lanasse*, 450 F.2d at 582. *See also Smith*, 803 F.2d at 1388. Both involved contractual language requiring indemnity for injuries "directly or indirectly connected with the possession, navigation, management and operation" of the vessel. *Hobbs*, 632 F.2d at 1241; *accord Lanasse*, 450 F.2d at 583. *See also Smith*, 803 F.2d at 1388–89. And in both cases, we held that "the operation of the crane was not even remotely related to the operation, navigation or management of the vessel." *Lanasse*, 450 F.2d at 583. *See also Hobbs*, 632 F.2d at 1241. As we noted in *Lanasse*, that contractual language "d[id] not comprehend an occurrence in which the vessel's sole contribution is to be there as the carrier from which the cargo is being removed." 450 F.2d at 583.

But neither *Smith*, *Hobbs*, nor *Lanasse* involved a reciprocal indemnity agreement like the contract in this case. In addition, in this case, Huisman clearly anticipated that part of Cole's role was to function as a member of the OCEAN PATRIOT's crew for approximately a month. Cole was present onboard—even when off duty—not as a "bystander," *Smith*, 803 F.2d at 1389, but in fulfillment of Huisman's contract to provide a crane operator on the vessel for a 28-day period. The provision of necessities, such as emergency medical care, for living onboard the vessel arises out of or is incident to those services.[6]

_____

[6] Huisman points to Pharma-Safe's response of "[n]one" to an interrogatory requesting evidence that Cole's "presence onboard the OCEAN PATRIOT caused or contributed to his alleged injuries." But the evidence supporting Cole's claim is relevant to the reasonableness of Pharma-Safe's settlement, not whether Cole's allegations fall within the scope of the indemnity agreement. *See Fontenot*, 791 F.2d at 1218 ("A court confronted with such an agreement should insure that the claim was not frivolous, that the

No. 23-30672

## III.

Huisman alternatively argues that, even if Cole's claims fall within the scope of the indemnity agreement, Pharma-Safe's settlement with Cole was unreasonable. Because the district court has not yet had the opportunity to address this issue, we remand for the district court to resolve this issue in the first instance. *See, e.g., Montano v. Texas*, 867 F.3d 540, 546 (5th Cir. 2017) ("[A] court of appeals sits as a court of review, not of first view.") (internal quotation omitted).

* * *

We reverse the district court's grant of summary judgment to Huisman and render summary judgment for Pharma-Safe on the indemnity agreement's scope. We remand for proceedings consistent with this opinion.

_____

settlement was reasonable, that it was untainted by fraud or collusion, and that the indemnitee settled under a reasonable apprehension of liability.").